John M. HEGARTY as Personal Representative of the Estate of Katherine A. Hegarty, Plaintiff, Appellee,

v.

SOMERSET COUNTY, Rene Guay, Wilfred Hines, Thomas Giroux, Jr., William Crawford, Jr., Defendants, Appellants.

John M. HEGARTY as Personal Representative of the Estate of Katherine A. Hegarty, Plaintiff, Appellee,

v.

SOMERSET COUNTY, et al., Defendants, Appellants.

John M. HEGARTY, Individually and as Personal Representative of the Estate of Katherine A. Hegarty, Plaintiff, Appellant,

v.

SOMERSET COUNTY, et al., Defendants, Appellees.

Nos. 94–1473, 94–1474, 94–1517.

United States Court of Appeals, First Circuit.

Heard Oct. 4, 1994.

Decided May 17, 1995.

William R. Fisher, with whom Monaghan, Leahy, Hochadel & Libby, Portland, ME, was on brief for appellants Guay, Hines, Giroux and Crawford and defendant-appellee Spencer Havey.

Frederick J. Badger, Jr., with whom Ann M. Murray and Richardson, Troubh & Badger, Bangor, ME, were on brief for appellant Wright.

Julian L. Sweet, with whom Jeffrey A. Thaler and Berman & Simmons, P.A., Lewiston, ME, were on brief for plaintiff/appellant Hegarty.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and McAULIFFE,* District Judge.

CYR, Circuit Judge.

On May 15, 1992, state and county law enforcement officers forcibly entered a remote cabin in the Maine woods, without a warrant, and mortally wounded plaintiff's decedent, Katherine A. Hegarty, while attempting to arrest her for recklessly endangering the safety of four campers. Plaintiff John M.

---

* Of the District of New Hampshire, sitting by designation.

Hegarty initiated the present action in federal district court for compensatory and punitive damages against the defendant officers and their respective supervisors, based on alleged violations of the Hegartys' statutory and constitutional rights. *See* 42 U.S.C. § 1983 (1992); Me.Rev.Stat.Ann. tit. 5, § 4682 (1992). After rejecting their qualified immunity claims, the district court determined that the defendant officers were potentially liable for punitive damages, and the officers initiated an interlocutory appeal. Plaintiff John M. Hegarty in turn cross-appealed from district court orders granting summary judgment in favor of Somerset County Sheriff Spencer Havey on qualified immunity grounds and disallowing plaintiff's section 1983 claim for compensatory damages for loss of spousal consortium.

## I

### BACKGROUND [1]

#### A. *The Warrantless Entry*

During the morning of the fateful day, two vehicles, containing four campers, entered through a gate onto woodlands owned by a paper company in Jackman, Maine, and proceeded to their assigned campsite about one and one-half miles past the gate and 200 yards or so beyond the Hegarty cabin. At around 9:00 that evening, Katherine Hegarty became extremely agitated when she saw the campers returning to their campsite for the night, and began screaming that they had trespassed on her property. The campers assured her that the caretaker had given them permission to use the campsite and they would be leaving the next morning. To which Katherine responded: "Only if you make it until morning." She then retrieved a rifle from inside the cabin and fired six rounds from the porch in the direction of the campers, who immediately took cover behind their trucks and boat.

During the next hour or so, Katherine reloaded her rifle several times, firing approximately twenty-five additional rounds in the direction of the campers before eventually yielding to their pleas for permission to

depart in safety. Leaving their other belongings behind, the campers drove their vehicles quickly past the cabin, where they saw Katherine on the porch, rifle in hand. Although no further shots were fired, Katherine followed the campers in her truck beyond the entrance gate, then turned back in the direction of her cabin.

Upon their arrival at a truck stop located on Route 201, approximately two miles from the woods road entrance gate, the campers immediately placed a telephone call to the Somerset County Sheriff's Department. Their report described a harrowing encounter with an intoxicated, distraught ("flipped out") and armed woman who might pursue them to the truck stop and shoot at them. Four law enforcement officers were dispatched to the truck stop—Maine State Trooper Gary Wright and three Somerset County Sheriff's Department officers: Patrol Sergeant Wilfred Hines, Deputy Sheriff Rene Guay, and Reserve Officer Thomas Giroux, Jr.

After briefly interviewing the four campers, the officers decided that the suspect had committed at least one offense by shooting at the campers. *See* Me.Rev.Stat.Ann. tit. 17–A, § 211 (1994) (reckless endangerment). Moreover, from the description the campers gave of the woman, the locations of the cabin and the campsite, and from their knowledge of the area, the officers concluded that Katherine Hegarty was their suspect. The officers knew that Katherine was an experienced hunter and a licensed Maine guide, with a reputation as a "crack shot," and that she kept several powerful firearms at her cabin. Further, the officers knew she had some history of emotional instability (*i.e.*, a nervous "breakdown" in 1991, requiring sedation, physical restraints and a brief period of involuntary hospitalization), substance abuse (two arrests for operating a motor vehicle while under the influence of alcohol ("OUI") in 1991), and incidents of erratic, violent behavior directed at law enforcement personnel—kicking and throwing punches at State Trooper Gary Wright, asking irrational questions, and exhibiting extreme mood swings

---

1. The relevant facts are related in the light most favorable to the plaintiff, the party resisting summary judgment. *Velez–Gomez v. SMA Life Assurance Co.*, 8 F.3d 873, 874–75 (1st Cir.1993).

(alternately screaming and laughing) at the time of her first OUI arrest, and an assault/harassment against Trooper Wright at his residence shortly after the same arrest. For these reasons, the officers concluded that they should arrest Katherine immediately, without obtaining a warrant or informing her of their true intentions until after she had been restrained, for fear that she would become violent.

At around midnight, the officers rendezvoused with a fifth officer, Sergeant William Crawford, Jr., of the Somerset County Sheriff's Department, drove about three miles and parked their cruisers approximately a mile from the Hegarty cabin. Their sporadic discussions since meeting at the truck stop had led to a skeletal plan of action for effecting the arrest. Concerned that Katherine might be waiting for them somewhere in the vicinity, they proceeded on foot toward her cabin, led by Trooper Wright—with a police dog—in an effort to forewarn themselves of Katherine's presence without heralding their approach. As they neared, at approximately 12:15 a.m., the officers observed Katherine's truck in front of the darkened cabin and heard a radio blaring music from inside. The clearing surrounding the cabin was plainly visible in the moonlight, but the cabin interior was not illuminated.

Following a quick visual inspection of the cabin site and the interior of the Hegarty truck, four officers approached unannounced and placed themselves along the outer cabin walls. The fifth officer, Thomas Giroux, Jr., who was better acquainted with Katherine Hegarty, gave a prearranged signal to the other officers from behind a tree across the road in front of the cabin. Giroux began calling to Katherine by name—first identifying himself and then expressing concern for her safety—in an attempt to coax her from the cabin to speak with him. Giroux heard no response above the blaring radio. Sergeant Hines then pounded on the cabin door and identified himself as a deputy sheriff. He received no response.

Meanwhile, Sergeant Crawford, who had worked his way around to the rear of the cabin, shined a flashlight into a darkened window and saw a fully-clothed woman lying on a bed, with a rifle astride her chest. When the woman began to raise the rifle in his direction, Crawford dove for cover, yelling out to the other officers that there was an armed person inside the cabin. Katherine soon asked Crawford to identify himself. After he did so, Crawford heard Katherine leave the bedroom and move toward the front of the cabin. The radio soon became inaudible.

As Katherine walked about inside the darkened cabin, she kept asking what the officers were doing there, and requested that they leave her property. The officers replied that they were investigating a report of campsite burglaries in the area, were concerned for her safety, and wanted her to come out of the cabin so she could speak with them. Laughing intermittently during these exchanges, Katherine ultimately rejected their requests—stating that she had seen no one suspicious.

Deputy Sheriff Rene Guay—posted outside the closed window at the front of the cabin—next saw Katherine face-to-face as she peered out the window from a kneeling position on a nearby couch. When Guay trained his flashlight on her, Katherine said, "I can see you." At this time, Guay observed that Katherine had no weapon in hand nor within the vicinity illuminated by his flashlight. Guay immediately communicated this information to Sergeant Hines and Trooper Wright, who were posted on either side of the front door, then gave them a signal to "go."

Sergeant Hines proceeded to break in the front door, but a chain lock momentarily delayed entry. From a crouched position outside the front window, Guay saw Katherine pick up a rifle beside the couch and begin to raise it in the direction of Hines and Wright, who were about to break through the front door. As she continued to raise the rifle in their direction, the officers ordered her to drop it. Katherine paid no heed and was fatally wounded by the officers before she could fire a shot.

## B.  *The District Court Proceedings*

In January 1993, John Hegarty, in his individual and representative capacities, filed

a four-count complaint in the District of Maine against, *inter alia*, the five officers and their respective supervisors, alleging deprivations of the Hegartys' Fourth and Fourteenth Amendments rights, *see* 42 U.S.C. § 1983 (1994), and their state and federal statutory and constitutional rights under the Maine Civil Rights Act ("MCRA"), Me.Rev. Stat.Ann. tit. 5, § 4682 (1994).[2] All defendants moved for summary judgment, asserting qualified immunity from suit under section 1983 and the MCRA, and contending that neither punitive damages, nor compensatory damages for loss of spousal consortium, are recoverable against them under section 1983 or the MCRA.

The district court ruled, *inter alia*, that (1) the five officers at the scene were not immune from suit under either section 1983 or the MCRA, because no objectively reasonable police officer could have concluded that the circumstances confronting these officers gave rise to an exigency sufficient to justify forcing a warrantless entry into the Hegarty cabin for the purpose of effecting Katherine's immediate arrest; (2) punitive damages would be recoverable were a jury to find that the officers at the scene acted with reckless indifference; (3) Somerset County Sheriff Spencer Havey was entitled to qualified immunity from suit relating to any "supervisory liability," since he had no advance notice that officer training was deficient, and since his subsequent conduct, though "troublesome," did not constitute "gross or reckless indifference"; and (4) compensatory damages for loss of consortium were not recoverable absent proof that the officers' conduct had been directed at John Hegarty rather than at his deceased spouse alone.

The officers promptly took interlocutory appeals from the first and second district court rulings. *See Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 90 (1st Cir. 1994) (disallowance of qualified immunity claim is "final" appealable order under *Cohen* "collateral order" doctrine). After the district court directed that final judgment enter pursuant to Fed.R.Civ.P. 54(b) on its third

and fourth rulings, plaintiff John Hegarty cross-appealed.

## II

### DISCUSSION

### A. The Officers' Immunity Claims

#### 1. Standard of Review

We review a summary judgment order *de novo*, under the identical criteria governing the district court, to determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Jirau–Bernal v. Agrait*, 37 F.3d 1, 3 (1st Cir.1994). All contested facts are viewed in the light most favorable to the party resisting summary judgment. *Id.*

#### 2. The Qualified Immunity Doctrine

Like other government officials performing discretionary functions, law enforcement officers hailed into court in their individual capacities to respond in damages are entitled to qualified immunity from suit in civil rights actions under section 1983, provided their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable [police officer] would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Burns v. Loranger*, 907 F.2d 233, 235 (1st Cir.1990). In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court refined the focus of the policy considerations underlying the qualified immunity doctrine.

When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S., at 814 [102 S.Ct. at 2736]. On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary

---

**2.** No appeal was taken from the district court judgment dismissing the wrongful death, *see* Me.

Rev.Stat.Ann. tit. 18–A, § 2–804 (1994), and common-law trespass claims.

liability and harassing litigation will unduly inhibit officials in the discharge of their duties. *Ibid.* Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 341 [106 S.Ct. 1092, 1096, 89 L.Ed.2d 271] (1986)....

*Anderson,* 483 U.S. at 638, 107 S.Ct. at 3038.[3] As this court has explained,

> appellate assessment of [a] qualified immunity claim is apportioned into two analytic components. First, if the right asserted by the plaintiff was "clearly established" at the time of its alleged violation, we are required to assume that the right was recognized by the defendant official, *see Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Rodriguez v. Comas,* 888 F.2d 899, 901 (1st Cir.1989); second, we will deny the immunity claim if a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right, *see Anderson,* 483 U.S. at 640–41, 107 S.Ct. at 3039; *Rodriguez,* 888 F.2d at 901.

*Burns,* 907 F.2d at 235–36.

█ The Hegartys correctly contend, of course, that the Fourth and Fourteenth Amendments to the United States Constitution prohibited a warrantless entry into the Hegarty cabin to effect Katherine's arrest, except in exigent circumstances and with probable cause. *See Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *Buenrostro v. Collazo,* 973 F.2d 39, 43 (1st Cir.1992). Indeed, the constitutional rights allegedly violated were clearly established long before this tragic incident occurred. Accordingly, the defendant officers are deemed to have been on notice of the relevant constitutional protec-

tions constraining their actions. *Burns,* 907 F.2d at 235–36. Therefore, qualified immunity affords the defendant officers no safe haven unless an *objectively* reasonable officer, similarly situated, *could have believed* that the challenged police conduct did *not* violate the Hegartys' constitutional rights. *Id.* at 236.

█ Thus, the qualified immunity inquiry does not depend on whether the warrantless entry was constitutional, but allows as well for the inevitable reality that *"law enforcement officials will in some cases reasonably but mistakenly conclude* that [their conduct] is [constitutional], and ... that ... *those officials*—like other officials who act in ways they reasonably believe to be lawful—*should not be held personally liable."* *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40 (emphasis added); *Burns,* 907 F.2d at 237. In other words, qualified immunity sweeps so broadly that "all but the plainly incompetent or those who knowingly violate the law" are protected from civil rights suits for money damages. *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986)); *cf. Roy v. City of Lewiston,* 42 F.3d 691, 695 (1st Cir.1994) ("[T]he Supreme Court's standard of reasonableness is comparatively generous to the police where potential danger, emergency conditions or other exigent circumstances are present.").

█ Lastly, we assess the challenged police conduct with a view to determining its *"objective legal* reasonableness," *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3039 (emphasis added), which entails two pivotal features. First, the qualified immunity inquiry takes place prior to trial, on motion for summary judgment, *see Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (qualified immunity provides a shield against the *burdens of litigation, not merely* a defense against liability for money damages), and requires no factfinding, only a ruling of law strictly for resolution by the

---

**3.** The same "qualified immunity" analysis applies to the MCRA claims. *See Jenness v. Nicker-* *son,* 637 A.2d 1152, 1159 (Me.1994).

court, *see Amsden v. Moran*, 904 F.2d 748, 752–53 (1st Cir.1990), *cert. denied*, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *Hall v. Ochs*, 817 F.2d 920, 924 (1st Cir.1987). Thus, under the policy-driven "objective *legal* reasonableness" analysis governing our inquiry, even expert testimony relating to appropriate *police procedures* in the circumstances confronting the officers may not afford certain insulation against summary judgment in the "qualified immunity" context.

We turn then to consider whether an objectively reasonable police officer *could* have believed—in the circumstances prevailing *before* Katherine Hegarty was mortally wounded—that "exigent circumstances" and "probable cause" existed for the forcible, warrantless, nighttime entry into the Hegarty cabin.

### 3. The Qualified Immunity Analysis
#### (i) Probable Cause

██ The "probable cause" requirement was met if the officers at the scene collectively possessed, *Burns*, 907 F.2d at 236 n. 7, "reasonably trustworthy information [sufficient] to warrant a prudent [person] in believing that [Katherine Hegarty] had committed or was committing a [criminal] offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). As the Supreme Court has explained, "[i]n dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). *See also Burns*, 907 F.2d at 236 (quoting *Gates*).

On appeal, the plaintiff contests the assumption—indulged *arguendo* by the district court—that there was probable cause for Katherine Hegarty's arrest. He argues that no competent officer in these circumstances reasonably *could* have believed that Katherine—a "crack shot"—intended to harm the campers, especially since no bullets struck the trucks and boat behind which the camp-ers took cover. We do not agree. Rather, based on the information that Katherine may have been intoxicated, an objectively reasonable officer could have concluded that her errant aim was not attributable to a lack of intent to endanger. Consequently, we conclude, based on the "reasonably trustworthy information" available to the defendant officers at the scene, *see supra* pp. 1370–71, that an objectively reasonable police officer could have formed the belief that there was probable cause to arrest Katherine Hegarty for the offense of reckless endangerment. *See, e.g.*, Me.Rev.Stat.Ann. tit. 17-A, § 211 ("A person is guilty of reckless conduct if he recklessly creates a substantial risk of serious bodily injury to another person."); § 15 (authorizing warrantless arrests for reckless conduct with a firearm).

#### (ii) Exigent Circumstances

██ A warrantless, forcible entry of a private residence is permissible in certain limited circumstances, including: (1) "hot pursuit" of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself. *See Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990). We have held that a cognizable exigency must present a "compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant." *United States v. Almonte*, 952 F.2d 20, 22 (1st Cir.1991), *cert. denied*, 503 U.S. 1010, 112 S.Ct. 1776, 118 L.Ed.2d 434 (1992) (quoting *United States v. Adams*, 621 F.2d 41, 44 (1st Cir.1980)). Conversely, certain mitigating factors may undermine a showing of exigent circumstances; for example, where the criminal offense was not sufficiently serious (a traffic violation), *Welsh*, 466 U.S. at 753 n. 6, 104 S.Ct. at 2099 n. 6, the opportunity afforded the suspect for peaceable surrender was inadequate, or the entry occurred in the nighttime. *See generally United States v. Adams*, 621 F.2d 41, 44 (1st Cir.1980).

The defendant officers challenge the district court ruling that no competent police officer could have formed an objectively reasonable belief that "exigent circumstances" justified a forcible, warrantless entry for the purpose of effecting Katherine Hegarty's immediate arrest. They argue that it was reasonable to believe—based on the reasonably trustworthy information available to them at the time—that Katherine posed an imminent and unpredictable threat to their safety, and to herself.

Earlier in the day, Katherine had engaged in violent, life-threatening conduct against peaceable, unarmed campers. She was known to have demonstrated emotional instability and hostility toward law enforcement personnel in the past, which had prompted her to attack and threaten State Trooper Wright on two separate occasions. At the cabin, she pointed a rifle directly at Sergeant Crawford, exhibited irrational and possibly suicidal behavior (laughing "like a witch") in response to the officers' repeated requests that she discuss matters with them. The defendant officers maintain that she could have decided at any time to fire at them through the "paper thin" cabin walls or as they attempted to retreat across the moonlit clearing. Consequently, the officers contend, there was an ongoing exigency which made it reasonable to attempt to disarm Katherine whenever it appeared least likely that she possessed or could retrieve a weapon.[4]

Plaintiff acknowledges that the officers did *not* use excessive force to protect themselves after they forcibly entered the cabin and were confronted by Katherine, with rifle raised. *Cf. Roy*, 42 F.3d at 695–96. Rather, he contends that their precipitous and ill-conceived strategy—arrived at *before* the officers ever left the truck stop—deviated un-

reasonably from standard police tactics in crisis situations and inexorably led to Katherine's death. *Cf. United States v. Curzi*, 867 F.2d 36, 43 n. 6 (1st Cir.1989) (police may not manipulate events to create an "exigency" justifying warrantless entry).

William McClaran, plaintiff's expert, testified that the defendant officers deviated in two fundamental respects from standard police practice in a crisis. First, they failed to define their exact "chain of command" before setting out to effect Katherine's arrest. Consequently, each officer at the scene was left to determine his own movements on an *ad hoc* basis ("free-lancing"), without adequate coordination among them.[5] Second, the officers eschewed accepted rules of "containment" by needlessly placing themselves in peril against the "paper thin" outer walls of the cabin. Plaintiff opines that upon approaching the cabin, the officers harbored a reasonable belief that Katherine was inside, given the music blaring from within the cabin and the presence of her truck in the cabin clearing. Consequently, and since the officers knew Katherine was armed and appeared to be acting irrationally, two officers should have taken concealed positions at the edge of the woods surrounding the cabin clearing, thereby cutting off any attempted escape. Thereafter, from a safer distance, other officers could have begun the effort to coax Katherine to come outside, while another officer returned to the police cruisers and radioed for assistance from the Maine State Tactical Team.

■■■ We must isolate all reasonably reliable information collectively known to the officers at the time their challenged conduct occurred, *without indulging hindsight, see Hunter*, 502 U.S. at 227, 112 S.Ct. at 536, to determine whether an "objectively reason-

---

4. Reserve Officer Giroux and Sergeant Crawford, who played no direct role in the forcible entry and were responding to orders, claim entitlement to qualified immunity by reason of their "lesser" participation. Given our holding, we need not address their claim.

5. McClaran pointed to several instances of "free-lancing" at the Hegarty cabin. First, although Officer Giroux alone had been charged with initiating communications with Katherine, Sergeant Hines unilaterally deviated from the arrange-

ment by banging on the cabin door. Second, the failure to coordinate their movements before arriving at the scene created the risk that the officers might be caught in their own cross-fire. Third, the officers gave Katherine confusingly different explanations for their presence at the cabin. Finally, the officers agreed that should a forcible entry become necessary, Sergeant Hines would enter first, whereas in fact a subordinate officer (Guay) ended up giving the irrepealable signal to launch the forcible entry.

able officer," with the identical information, *could* have concluded that there were exigent circumstances sufficient to support an immediate forcible entry of the Hegarty cabin to effect Katherine's warrantless arrest. *See Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Any genuine *dispute* as to what the officers *knew or did* must be resolved in the plaintiff's favor. *See Fonte v. Collins,* 898 F.2d 284, 285 (1st Cir.1990). Even then, however, summary judgment for the defendant officers would be appropriate if any such factual dispute were immaterial as a matter of law; that is, if it would not alter the required analysis as to the *"legal* reasonableness" of their conduct. *See, e.g., Prokey v. Watkins,* 942 F.2d 67, 73 (1st Cir.1991) (citing cases in which material factual disputes precluded summary judgment on qualified immunity claim); *see also Cameron v. Seitz,* 38 F.3d 264, 273 n. 2 (6th Cir.1994) (same).[6]

Following a careful examination of the applicable law and all competent evidence presented to the district court at summary judgment, we conclude that the benchmark against which plaintiff would have us evaluate the challenged police conduct is impermissibly stringent for the qualified immunity context, since it fails to acknowledge an overarching reality confronting the officers at the most critical moment of decision; *viz.,* until Sergeant Crawford saw Katherine Hegarty through the bedroom window of the cabin, *there was no conclusive evidence that their suspect had been located or contained at all.*

The officers initially devised a "plan" which they characterized as "locate, identify, contain, negotiate, and arrest." Obviously, "location" and "identification" would be imperative *before* any other element in their plan could proceed. The officers knew that Katherine had fired approximately *thirty rounds* toward the campers earlier in the evening. And, in addition to their collective knowledge

of her erratic, unlawful behavior in the recent past, the officers had learned from the campers that Katherine was last seen *driving her truck.* A competent police officer in these circumstances—possessed of this disturbing information—certainly could harbor an objectively reasonable concern that Katherine might yet remain *mobile,* thereby posing a continuing danger to other persons *in the vicinity.*

Several other campsites in the vicinity of the Hegarty cabin were occupied, and without knowing the precise motivation for Katherine's unprovoked, armed response to the peaceable presence of the four campers earlier in the evening, an objectively reasonable officer prudently could presume that other campers might be at similar risk. In fact, their use of the police dog while proceeding along the woods road toward the cabin attests to the officers' alertness to the possibility that Katherine could be lying in wait in the woods. Deciding not to take the risk attendant upon the delay necessarily entailed in obtaining a warrant, the officers accordingly placed top priority on *conclusively locating* their suspect at the earliest possible time so as to minimize the threat posed to the safety of other campers. *See Olson,* 495 U.S. at 100, 110 S.Ct. at 1690 (exigent circumstances include the need to safeguard against threats to life or safety of others); *Almonte,* 952 F.2d at 22.[7]

Quite contrary to the major premise for William McClaran's expert opinion, by the time they arrived at the Hegarty cabin the officers had received decidedly *mixed* signals concerning their suspect's location. The parked truck suggested that Katherine might be inside the cabin, but the lack of artificial illumination suggested otherwise. The blaring music did not conclusively disprove either hypothesis. Nor had Katherine been seen or heard entering or moving about inside the cabin. Thus, it was in no sense improbable

---

6. We need to note the obvious as well. Even though the isolation of the Hegarty cabin and the death of Katherine Hegarty dictate that virtually all relevant evidence derives exclusively from the officers at the scene, *see Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994) ("the officer defendant is often the only surviving eyewitness" in qualified immunity cases), summary judgment nonetheless

must be granted absent a genuine dispute as to a material issue. *See Jirau–Bernal,* 37 F.3d at 3.

7. The exigency created by the realistic danger the unlocated suspect posed to other campers in the vicinity likewise substantially mitigated an aggravating factor noted by the district court: the fact that the warrantless entry took place at night.

that Katherine, a licensed guide and experienced hunter, had left her vehicle and departed the cabin site on foot.

Nor was the alternative police strategy posited by Mr. McClaran without its shortcomings. Of course, had the officers chosen to cordon off the cabin from a "safe" distance, and begun calling out to Katherine in the hope they might negotiate her surrender—*and had she responded*—the "containment" phase could have proceeded apace. On the other hand, had she simply failed to respond—either because she could not hear their calls above the blaring music, or because she had fully expected them to investigate the campers' allegations and wanted to keep them off guard—the officers still would be left to speculate whether she was in the cabin.

Since time was of the essence, and it was imperative that they locate and identify their suspect so as to rule out the continuing danger she could pose to others in the vicinity, the officers then would have faced an irreconcilable quandary. They could undertake a "containment" strategy along the lines propounded by McClaran, which would necessitate a delay of several hours for the Maine State Tactical Team to reach the cabin, thereby countenancing the realistic risk that their suspect might be elsewhere at that very moment jeopardizing the safety of others.[8] Or, having heralded their arrival, the officers could have attempted to confirm Katherine's presence through visual contact, by approaching the outer walls of the darkened cabin across the moonlit clearing, thereby exposing themselves to gunfire from their armed and unpredictable suspect—by then forewarned and concealed.

Law enforcement officers quite often are required to assess just such probabilities, and to weigh the attendant contingencies. And it is precisely such spontaneous judgment calls—borne of necessity in rapidly evolving,

life-endangering circumstances—that the qualified immunity doctrine was designed to insulate from judicial second-guessing in civil actions for money damages, unless the challenged conduct was clearly incompetent or undertaken in plain violation of established law. *See Hunter,* 502 U.S. at 229, 112 S.Ct. at 537; *Anderson,* 483 U.S. at 638, 107 S.Ct. at 3038.

Thus, we do not determine which of these strategies represented the *more* prudent course or posed the *least* serious risk to the suspect, the officers or others in the vicinity. *See Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994) (noting that "[o]fficers need not avail themselves of *the least intrusive means* of responding to an exigent situation; they need only act within that range of conduct [which is] '... reasonable"; contrary rule "would inevitably induce tentativeness by officers"). Rather, we consider only whether a competent police officer in these circumstances reasonably could have opted for an unannounced approach to the cabin walls forthwith.

As we conclude that a competent police officer reasonably could have believed that exigent circumstances warranted approaching the cabin walls—*forthwith and unannounced*—we turn to the remaining question: whether the defendant officers—once committed, and assured that Katherine was inside the cabin where she no longer posed a viable threat to other campers—reasonably could have believed that she represented an imminent physical threat to their own safety.[9] *See Olson,* 495 U.S. at 100, 110 S.Ct. at 1690.

The expert testimony on which plaintiff relies makes much of the notion that the entire plan for approaching the outer cabin walls was ill-conceived and uncoordinated *ab initio,* whereas the officers plausibly contend that they had worked together as a team so often in the past that their basic plan and

---

**8.** Once the tactical team had arrived, moreover, it would still have been necessary to confirm—by some means—Katherine's presence in the cabin.

**9.** Although we need not resolve the matter definitively, we have serious reservations whether the officers' actions were justified by concern that Katherine might take her own life. True, the

objective evidence indicated that she had exhibited behavior both violent and unpredictable, yet the evidence revealed that her conduct was directed at third parties, never herself. Nor had she said anything to the officers that might indicate suicidal intent.

tactics were implicitly understood. But even accepting William McClaran's prescription as to an appropriate police procedure for use in these circumstances, plaintiff does not explain how a differently formulated plan—devoid of the suggested deficiencies in the officers' plan—inevitably would have averted the exigency ultimately confronting them. *See supra* notes 5 & 8. Indeed, none of the consequences McClaran attributed to the alleged absence of a "chain of command," or to lack of coordination in the officers' plan, clearly constituted a *causative* factor in Katherine's death.[10] Rather, the causative exigency derived primarily from three factors over which the officers never had exclusive control: the need to ascertain Katherine's precise location as soon as possible, her unpredictable behavior, and the lack of protective cover for their own movements in locating and containing her.

Second, though plaintiff argues that the officers delayed their forcible entry until *they* were safest—when it "appeared" to Officer Guay that Katherine was unarmed and beyond arm's reach from a firearm—surely this argument exaggerates their on-the-spot sense of personal security by failing to assess the imminence of a perceived danger in light of the *totality of the circumstances*. *See United States v. Veillette*, 778 F.2d 899, 902 (1st Cir.1985) (exigency is assessed by viewing "totality" of circumstances), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

Katherine moved freely about the unilluminated interior of the locked cabin, which contained deadly firearms whose exact number and location were unknown to the officers. *Cf., e.g., United States v. Smith*, 797 F.2d 836, 841–42 (10th Cir.1986) (exigency established for warrantless entry where agents approached aircraft with probable cause to believe it might harbor armed drug dealers); *United States v. Guarente*, 810 F.Supp. 350, 352–53 (D.Me.1993) (exigency established for warrantless entry where officers remained uncertain about the intentions of armed suspects who might remain inside structure). Only minutes before, Katherine had pointed her rifle at Sergeant Crawford. *Cf. O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir.1994) (qualified immunity claim disallowed where suspect "had taken no action against the officers" and "did not point the gun at anyone"; noting that threat to police must be "immediate").[11] Prior to their forced entry, the officers realized that the cabin walls were "paper thin,"[12] thus affording insufficient cover should Katherine decide to fire from inside the cabin—a serious contingency that competent officers reasonably could take into account given the violent, irrational and unpredictable behavior recent-

---

**10.** Plaintiff misfocuses the "qualified immunity" analysis by inquiring whether *all aspects* of the officers' conduct were executed in the manner to be expected of an "objectively reasonable" officer, rather than whether the *particular decisions which led to Katherine's death* reasonably could have been made by such an officer. Thus, for example, even assuming the plan increased the risk that an officer might be caught in another officer's cross-fire, the subsequent decision to enter and disarm Katherine was not implicated thereby. Furthermore, the officers' "differing" responses to Katherine's inquiries were not so much confusingly inconsistent, as consistently misleading. But their responses were also deliberately designed to reduce the risk that she might react violently, as by their consistent expressions of concern for Katherine's safety and their scrupulous avoidance of any mention of her impending arrest.

**11.** Although plaintiff argues that this incident cannot serve to establish an exigent circumstance—because Katherine may have pointed the gun at Crawford *before* she recognized that he was a police officer—omniscience is not the pre-

sumed mindset with which an objectively reasonable police officer approaches life-endangering decisions. The correct focus must be on the significance an objectively reasonable police officer might attach to the threatening action, in circumstances where he—like Sergeant Crawford—could not *know*, with assurance, the suspect's exact state of mind or intent. *Cf., e.g., Gibson v. Officer, P.A.*, 44 F.3d 274, 277–78 (5th Cir.1995) (proper focus is not upon factual dispute as to whether suspect was intoxicated, but whether objective facts might lead a reasonable officer so to conclude); *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir.1991) (police officer's belief that suspect was reaching for gun was "reasonable" even though object turned out to be a bottle).

**12.** Their vulnerability to gunfire from within the cabin was later confirmed. McClaran himself noted that several police bullets—fired immediately after the forcible entry—passed *through* the cabin walls.

ly exhibited by their barricaded suspect, including her peculiar bouts of laughter, history of emotional instability and demonstrated antagonism toward law enforcement personnel. In such circumstances, competent police officers reasonably could conclude that to announce their intention to place the barricaded suspect under arrest—dispensing with their ruse that they were there only to help her—might well spark renewed violence.

Finally, once their objectively reasonable locate-and-contain strategy had positioned several officers in unexpectedly vulnerable positions against the thin cabin walls, *cf. Curzi*, 867 F.2d at 43, they could neither remain in their positions indefinitely nor safely terminate the impasse by attempting to retreat across the moonlit cabin clearing without directly exposing themselves to potential gunfire. Thus, safe and indefinite containment—either from their vulnerable positions against the cabin walls or from a "safer" distance—no longer remained a practicable alternative. *Cf. United States v. Wilson*, 36 F.3d 205, 210 (1st Cir.1994) (upholding denial of motion to suppress evidence because police officers should not be required to remain indefinitely outside apartment located in building which was well-known site of prior drug sales and police shootings); *Guarente*, 810 F.Supp. at 352–53 (finding it reasonable for police to enter building in circumstances where their alternative was to remain potential targets for any concealed armed suspect who might be inside); *cf. also United States v. Hardy*, 52 F.3d 147, 149 (7th Cir.1995) (finding exigent threat to officer safety where armed suspect, with known history of violence and drug use, was inside locked motel room and within "easy reach" of powerful firearm); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir.1992) (finding that no unreasonably excessive force had been used against an armed and "suicidal" person—barricaded inside apartment—who had made threatening statements toward police officers while in intermittent close proximity to them, and showed signs of serious mental instability); *Smith*, 797 F.2d at 841 (exigency established where officers had probable cause to believe aircraft, which had landed at isolated airfield after dark, might harbor armed drug dealers).

We therefore conclude that a competent police officer—possessing the same information the defendant officers had on May 15, 1992—reasonably could have believed both that there existed probable cause to arrest Katherine Hegarty and exigent circumstances justifying their immediate warrantless entry. Consequently, the summary judgment order entered by the district court must be vacated, and summary judgment must be entered for the defendant officers.

**B. *Sheriff Havey's Qualified Immunity Claim***

Although Somerset County Sheriff Spencer Havey did not participate in the events of May 15, 1992, plaintiff advances two related challenges to the summary judgment order entered in favor of Havey. First, plaintiff argues that Havey failed to train his officers adequately or to institute written standard operating procedures ("SOPs"), even though it was reasonably foreseeable that these deputy sheriffs likely would encounter so-called "barricaded felon" cases on a frequent basis in rural, wooded Somerset County. Second, even assuming that a need for additional training and SOPs had not been foreseeable prior to the Hegarty incident, Sheriff Havey's *subsequent* conduct would enable a factfinder to infer that Havey had condoned the officers' conduct, or been indifferent to the need for better training long before May 15, 1992. For example, Sheriff Havey refused to discipline his officers for the fatal shooting of Katherine Hegarty, as recommended in the Attorney General's final investigative report. Nor did he institute additional training, as recommended by a citizen review board convened by Havey in the wake of the tragic event.

**1. *Applicable Law***

Under 42 U.S.C. § 1983, supervisory law enforcement officers incur no *respondeat superior* liability for the actions of their subordinates. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202–03, 103 L.Ed.2d 412 (1989). Absent participation in the challenged conduct, a supervisor "can be held liable ... [only] if (1)

the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was '*affirmative[ly] link[ed]*' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence [of the supervisor] amounting to *deliberate indifference.*' " *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902–03 (1st Cir.1988) (emphasis added) (citations omitted); *see Rodriques v. Furtado,* 950 F.2d 805, 813 (1st Cir.1991) (discussing deliberate indifference to officer training). Deliberate indifference will be found only if "it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Febus–Rodriguez,* 14 F.3d at 92 (quoting *Germany v. Vance,* 868 F.2d 9, 18 (1st Cir.1989)). The "affirmative link" requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation. *See id.; see also Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992).

### 2. *Application of Law to Facts*

The determination that a subordinate law enforcement officer is entitled to qualified immunity from suit under section 1983 is not necessarily dispositive of the supervisor's immunity claim. Nevertheless, it does increase the weight of the burden plaintiff must bear in demonstrating not only a deficiency in supervision but also the essential *causal connection* or "affirmative linkage" between any such deficiency in supervision and the alleged deprivation of rights. We conclude that plaintiff has not carried this heavy burden.

We find the district court's preliminary analysis of Sheriff Havey's qualified immunity claim to be well reasoned and persuasive. The evidence demonstrates that Sheriff Havey, newly elected to office, had no notice that the deputy sheriffs were experiencing problems in dealing with "barricaded suspect" confrontations prior to the incident in question. *Cf. Febus–Rodriguez,* 14 F.3d at 92. Indeed, their police academy training and instruction time relating to warrantless

entries *exceeded* the national average. *See Canton,* 489 U.S. at 389, 109 S.Ct. at 1205. Moreover, rather than simply ignore the Hegarty incident, Havey suspended all officers involved and convened a panel to investigate and make recommendations. Although it is entirely understandable that plaintiff would fault Sheriff Havey for not accepting or adopting the recommendations made by the advisory panel, such a decision is insufficient, standing alone, to establish deliberate indifference. *See, e.g., Santiago v. Fenton,* 891 F.2d 373, 382 (1st Cir.1989) (decision not to discipline or fault subordinates' conduct, following investigation, is insufficient, standing alone, to demonstrate supervisor's "deliberate indifference"); *see also Fraire,* 957 F.2d at 1278–79.

Even though the district court ruled that Havey's subsequent conduct did not amount to deliberate indifference, it expressed serious reservations concerning some of his conduct, *see Bordanaro v. McLeod,* 871 F.2d 1151, 1166–67 (1st Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989) (postincident conduct may be relevant to "deliberate indifference" inquiry); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987) (same), notably Havey's failure to acknowledge the need to *prescribe* SOPs or to institute in-house training for handling "barricaded felon" cases. Nevertheless, the rationale for our decision that the individual officers at the scene acted within the bounds of objective reasonableness, *see supra* Section II.A, plainly undermines most of the district court's concerns.

Most importantly, plaintiff failed to demonstrate the required "affirmative link" between Havey's conduct and Katherine Hegarty's death. That is, he has not sustained the burden of establishing that any lack of "barricaded felon" training on the part of the Somerset County Sheriff's Department officers at the scene caused Katherine's death. *Cf., e.g., Manarite v. City of Springfield,* 957 F.2d 953, 958 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992). First, even the plaintiff's expert declined to characterize the Hegarty incident as a *typical* "barricaded felon" case. And, unlike the

typical "barricaded felon" case, these officers at the outset had no conclusive evidence but that their suspect *remained at large.*

Moreover, even assuming the best efforts of the most prescient supervisor, it simply is not possible to anticipate the *entire* array of atypical circumstances—upon which sensitive *discretionary* judgment calls must be made by the officer in the field—for inclusion in a law enforcement agency's standard operating procedures. For example, even indulging an impermissible measure of hindsight, we do not believe that SOPs, however elaborate, would have enabled the defendant officers at the scene to resolve by *safer or more reliable means* whether Katherine was inside the cabin at the time the officers first arrived. So, too, in the end, Sheriff Havey—after initiating an immediate investigation into the officers' actions—formed the professional opinion, rightly or wrongly, that the judgment calls made at the scene were reasonable.

Finally, though plaintiff would characterize Sheriff Havey's subsequent conduct as pure obstinacy, *the cloak of qualified immunity nonetheless remains in place* unless "it would be manifest to any reasonable official" in the supervisor's position that the failure to establish such a policy or to institute in-house training *prior to the Hegarty incident* "was very likely to violate an individual's constitutional rights." *Febus–Rodriguez,* 14 F.3d at 92. As plaintiff failed even to approach the threshold for such a showing, we affirm the district court ruling allowing the qualified immunity claim asserted by defendant Havey.

### III

### *CONCLUSION*

We cannot know whether the tragic death of Katherine Hegarty would have been averted but for the judgment calls made by the defendant officers at the scene, nor is that the inquiry we make in a civil rights action for damages against the individual officers. We determine only whether the discretionary decisions made by the defendants were within the broad range of reasonable conduct to be expected from competent police officers and their supervisors in like circumstances. As the actions of the defendant officers and their supervisor plainly met the latter standard, the district court order denying summary judgment to the defendant officers must be reversed and the judgment in favor of defendant Havey must be affirmed.

*The judgment for defendant Havey is affirmed and the case is remanded to the district court with instructions to vacate the judgment entered for plaintiff and enter summary judgment for the defendant officers, and for such further proceedings as may be appropriate and consistent with this opinion. The parties shall bear their own costs on appeal.*