**UNITED STATES of America, Appellant,**

v.

**Carol E. ADAMS, Defendant-Appellee.**

**No. 79–1500.**

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1980.
Decided May 28, 1980.

---

**42**

Paul F. Healy, Jr., Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellant.

Alan R. Hoffman, Boston, Mass., with whom Lynch, Brewer, Hoffman & Sands, Boston, Mass., was on brief, for defendant, appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

On October 17, 1978, five F.B.I. agents and two uniformed policemen entered the apartment of defendant-appellee Carol E. Adams in search of an escaped convict, Marlene Martino, who was found hiding in a closet. No search or arrest warrant had been obtained. Adams was subsequently indicted for harboring a fugitive in violation of 18 U.S.C. § 1072.[1] The sole issue on appeal, brought by the government pursuant to 18 U.S.C. § 3731,[2] is whether the district court erred in suppressing evidence of the seizure of the escaped felon at defendant's apartment on the grounds that there were no exigent circumstances justifying the warrantless entry. Neither the question of probable cause nor that of consent to the search is before us. Defendant has conceded that there was probable cause and the government itself, as will be discussed later, removed the issue of consent from the case.

Because the Supreme Court had left unresolved the question of whether both probable cause and exigent circumstances are prerequisites to an officer's entry into a suspect's home to make a warrantless arrest,[3] we held up this opinion pending the Court's decision in *Payton v. New York*, —— U.S. ——, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). While *Payton* does not address directly the issue before us,[4] the reasoning leading to its holding that the fourth amendment proscribes a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest, *id.* at ——, 100 S.Ct. at 1374–75, convinces us that the use of Martino's seizure as evidence against defendant can only be upheld if there were exigent circumstances. *Payton* stresses the protection that the fourth amendment gives to a person's home:

> As the court unanimously reiterated just a few years ago, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313 [92 S.Ct. 2125, 2134, 32 L.Ed.2d 752]. And we have long adhered to the view that the warrant procedure minimizes the danger of needless intrusions of that sort.

*Id.* at ——, 100 S.Ct. at 1379–80 (footnote omitted). The court emphasized the differ-

---

1. § 1072. *Concealing escaped prisoner*
   Whoever willfully harbors or conceals any prisoner after his escape from the custody of the Attorney General or from a Federal penal or correctional institution, shall be imprisoned not more than three years.

2. § 3731 provides in pertinent part:
   An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [*sic*] suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

3. *United States v. Watson*, 423 U.S. 411, 418 n.6, 96 S.Ct. 820, 825 n.6, 46 L.Ed.2d 598 (1976).

4. "Nor do these cases raise any question concerning the authority of the police, without either a search or arrest warrant, to enter a third party's home to arrest a suspect." *Payton v. New York*, —— U.S. ——, ——, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980).

ence between a warrantless seizure in an open area and one on private premises, *id.* at ——, 100 S.Ct. at 1380, and concluded: "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at ——, 100 S.Ct. at 1373.

We turn to the facts. In early October of 1978, the administrator of the Federal Correctional Institution in Alderson, West Virginia, telephoned Special Agent Gallagher of the Boston F.B.I. office to report that Marlene Martino had recently escaped. Martino had been incarcerated for life in 1975, after having been convicted of the contract murder of a soldier. She effected her escape by walking out the back door of a dentist's office in Roanoke, Virginia, where she had been taken for treatment. The prison administrator also informed Agent Gallagher that Martino and Adams had been confined together at Alderson and were well acquainted.

During this same time period, Gallagher received a phone call from Lieutenant Ryan of the Revere, Massachusetts, police force. Ryan informed Gallagher that an informant had told him that Adams received a phone call from Martino who said that she was south of Boston and on her way to Adams' apartment in Revere. Gallagher checked with the Revere police during the next two weeks, but learned nothing more of Martino's whereabouts.

On the afternoon of October 16, 1978, Gallagher was called by a Mrs. Nana Goldberg, the assistant director of a social service agency in Malden, Massachusetts. According to Gallagher's testimony, Mrs. Goldberg informed him that Mrs. Jamison, the housekeeper assigned to work at Adams' apartment, reported that an escaped murderess named Martino was staying there and had been there for some period of time. Mrs. Goldberg also told Gallagher that, according to Jamison, Martino had hidden in the basement of the building when a parole officer came to call on Adams. Gallagher testified that he asked Mrs. Goldberg to have Mrs. Jamison determine the next day whether or not Martino was still at the Adams apartment. At 8:30 a. m. on the following day, October 17, Gallagher received a telephone call from Mrs. Goldberg with the message that Martino was still at the Adams residence. Gallagher and four other F.B.I. agents then went to the Revere police station, where they were joined by two uniformed officers, and all then proceeded to the Adams apartment. Gallagher made no attempt to procure either an arrest or a search warrant prior to going to the apartment. He testified that, in making the arrest, he was relying on statutory authority alone, meaning 18 U.S.C. § 3052.[5]

The police and F.B.I. agents arrived at Adams' apartment at approximately 9:50 a. m. They knocked on the back door and were met by defendant restraining an agitated Doberman pinscher. They asked her to put the dog in another room, which she did. Believing defendant to be Martino, the agents immediately put handcuffs on her, which stayed on until a neighbor was brought in who verified her claim that she was Carol Adams and not Martino. Adams denied that Martino was in the apartment but, after a short search, Martino was found in a bedroom closet.

At a suppression hearing before a magistrate, Agents Gallagher and Ross testified on the issues of probable cause and exigent circumstances. The magistrate found both probable cause and exigent circumstances and also that Adams had consented to the

---

5. § 3052. *Powers of Federal Bureau of Investigation*

The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

search. He therefore recommended denial of the motion to suppress.

By agreement of counsel, Mrs. Goldberg's deposition was taken subsequent to the magistrate's recommendation. In her deposition testimony, Goldberg recalled speaking to both Mrs. Jamison and Agent Gallagher on the afternoon of October 16, 1978. Her version of the events differed from Gallagher's in that she had no recollection of being requested to have Mrs. Jamison determine whether Martino was still at the Adams apartment on the morning of October 17. She was sure that she had not spoken to Mrs. Jamison on the morning of October 17, but did remember speaking with Agent Gallagher and telling him that she did not think Mrs. Jamison had mentioned the presence of weapons in the Adams' apartment.

At defendant's request, an evidentiary hearing on the motion to suppress was held before the district court on August 28, 1979. The court considered the testimony adduced before the magistrate, as well as the Goldberg deposition, and decided that there was not such an exigency as would justify the warrantless search.

During the hearing, the court asked, "Does the government claim that there was consent here?" The reply was, "No, Your Honor." In light of this, it is difficult for us to understand the government's statement in its brief that "the entry into defendant's residence was peaceful, indeed the defendant permitted the agents to enter the apartment." Brief at 14. Our review is of the district court's opinion; we therefore assume, as it did, that the government does not claim that consent was given to enter defendant's apartment. We add that, short of turning the dog loose, there was

not much defendant could have done when confronted with seven men at her door, two in police uniforms, particularly since they believed she was the escaped felon and acted on that assumption by handcuffing her as soon as they entered the apartment.

The government recognizes that it has the burden of showing exigency. It argues that, under these circumstances, a prudent and cautious officer could reasonably have concluded that immediate action was necessary. It relies heavily on the seven factors discussed in *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir.1970).[6] While the *Dorman* analysis has value, it is not to be used in the way the government does, as a pass or fail checklist for determining exigency. The ultimate test is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant. The facts here show no such necessity.

Agent Gallagher knew two weeks prior to her arrest that Martino had escaped from prison and was probably on her way to defendant's home. On the afternoon of October 16, he was informed that Martino was at the apartment and had been there for some time. At 8:30 a. m. of the following day, her presence there was confirmed. Gallagher was given no information other than the fact that Martino was an escaped felon; he had no idea whether she was armed or was preparing to flee. In fact, the only information he had as to weapons or flight was negative; Mrs. Jamison did not mention any weapons being in the apartment and when defendant's parole officer visited the apartment, Martino hid in the cellar.

There was no reason why either an arrest or search warrant[7] could not have been obtained during the afternoon or evening of

---

**6.** The factors can be summarized as follows: (1) that a grave offense is involved; (2) that the suspect is reasonably believed to be armed; (3) that there is a clear showing of probable cause that the suspect committed the crime involved; (4) a strong reason to believe that the suspect is on the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended; (6) that the entry, though not consented, is

made peaceably; and (7) whether the entry is in daylight or at night.

**7.** We do not decide whether a search warrant rather than, or in addition to, an arrest warrant was required, since neither was obtained. In *Government of Virgin Islands v. Gereau*, 502 F.2d 914, 928 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975), it was held that a search warrant was required. *But see United States v. Cravero*, 545 F.2d 406,

October 16. Like the district court, we are incredulous at the magistrate's finding that the agents might reasonably have assumed that a magistrate or judge would not be available at 8:30 a. m.[8] But even assuming the reasonableness of such an assumption, there was no reason why the apartment could not have been staked out at 9:50 while the warrant was obtained. There were only two doors to the apartment to watch, hardly beyond the capacity of seven law enforcement officers. This was not a case of hot pursuit as in *Warden v. Hayden*, 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967). Nor was this a situation like *United States v. Edwards*, 602 F.2d 458, 468 (1st Cir. 1979), where the exigency was the necessity to prevent the destruction of evidence, nor one where there was a danger that bombs might explode injuring innocent people. *United States v. Picariello*, 568 F.2d 222, 226 (1st Cir. 1978). This is simply not a case where there was compelling need for official action and no time to secure a warrant. *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978). The testimony of Agent Ross makes it clear that no thought at all was given to obtaining a warrant because "[t]here would be no reason to." The F.B.I. agents relied on their statutory authority under 18 U.S.C. § 3052 to arrest Martino. This, however, did not give them the right to enter defendant's home without a warrant and without her consent and then use Martino's seizure as evidence against the defendant in a criminal action for harboring a fugitive.

*Affirmed.*

421 (5th Cir. 1976) (on petition for rehearing), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977), holding that an arrest warrant was sufficient. The Supreme Court in *Payton* indicated that an arrest warrant founded on probable cause would suffice to support entry of "a dwelling in which the suspect lives," —— U.S. at ——, 100 S.Ct. at 1388, but, as noted earlier, did not address the issue as to third-party residences.

**8.** The district court stated: "There is absolutely no reason whatever for government agents not to seek out a magistrate or a judge at 8:30 in the morning. My heavens. I cannot conceive of an agent not seeking out a judge or a magistrate at eight in the morning or even at 7:30 in the morning."