June 23, 2017

**Supreme Court**

No. 2009-46-C.A.

(P2/07-4007AG )

| | |
|---|---|
| State | : |
| v. | : |
| Boghos Terzian. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Boghos Terzian. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on February 8, 2017, on appeal by the defendant, Boghos Terzian (defendant or Terzian), from judgments of conviction entered in the Superior Court following a jury trial.  The defendant was convicted on three counts of assault with a dangerous weapon and one count of carrying a pistol without a license.  Before this Court, the defendant contends that the Superior Court justice erred in denying his motion to suppress evidence seized by police during a warrantless search of his home.  For the reasons set forth herein, we vacate the judgments of conviction.

**Facts and Travel**

This case turns on whether a warrantless entry into defendant's home, after he was placed in the custody of the Providence police, followed by a search and warrantless seizure of a firearm and a can of pepper spray, pass constitutional scrutiny.  In considering whether the search exceeded the bounds of reasonableness, we confine our analysis to the evidence presented at the pretrial suppression hearing in Superior Court, upon which the Superior Court justice based his decision denying the motion to suppress.

- 1 -

In the late evening hours of July 31, 2007—nearly ten years ago—the Providence police received a 9-1-1 call indicating that gunshots had been fired in the Pumgansett Street area of the city.[1] Patrolman Scott Zambarano (Patrolman Zambarano) responded to the call and was dispatched to the parking lot of a Walgreens located approximately one-half mile from Pumgansett Street. Upon his arrival, Patrolman Zambarano was approached by a man who identified himself as Vito.[2] Vito informed Patrolman Zambarano that defendant, who "lived on Pumgansett Street," had "shot his back window out and beat up his girlfriend." Patrolman Zambarano, accompanied by his supervisor, Sgt. Roger Aspinall (Sgt. Aspinall), and numerous police officers, in several marked cruisers, responded to defendant's home—a single-family dwelling located at 19 Pumgansett Street. According to the officers, when they arrived at the scene, the smell of gunpowder was still in the air and the officers noticed shards of broken glass scattered around the street. The officers mistakenly went to the house next door. Patrolman Zambarano subsequently knocked on the front door of 19 Pumgansett and was met by defendant, who exited the house to speak to the officers. He appeared to the officers to be "highly intoxicated." The defendant stated that there had been a "rift" in front of the house caused by "Spanish kids from the project[s]." The patrolman stated that, at some point during the conversation, defendant became "uncooperative" and "belligerent." The defendant was seated in a police cruiser until he was identified by Vito as the person with the firearm; he was then placed in handcuffs and returned to the cruiser.

---

[1] The delay in this case is attributable to a remand by this Court for the purpose of a hearing on a motion for a new trial. After four years in Superior Court, the motion for a new trial was withdrawn, and the case was returned to this Court for recommencement of this appeal.

[2] This person subsequently was identified as Vito A. Cocci, the complainant in count 1 of the criminal information that is the subject of this appeal.

Patrolman Zambarano testified that Stephanie Kruwell (Stephanie), who identified herself as defendant's fiancée, and her daughter, Samantha Kruwell (Samantha),[3] emerged from the house. Samantha informed Patrolman Zambarano that she had been in a fight with her boyfriend and that someone had been pepper-sprayed during the altercation. Patrolman Zambarano testified that he asked the women whether there were any guns inside the house, and Stephanie initially responded in the negative; but she then volunteered that "there were guns in the house" and that the officers could go inside and search. Patrolman Zambarano did not inquire of defendant or Stephanie as to who lived in the house. The officer testified that he assumed that Stephanie and Samantha lived in the house and did not ask her for permission to enter the home, nor did he ask Samantha where she lived. Significantly, when the Superior Court justice pointedly asked Patrolman Zambarano to state the factors that led him to conclude that Stephanie lived in the house, before he entered, he responded, "Just assumption, I guess, your Honor."

Patrolman Zambarano testified that the officers "responded inside the house, and Stephanie pointed out where the gun was in the house." He stated that Stephanie "pointed out a bureau," with clothes "stacked on top of the bureau and [she said that] the gun would be under the clothes on the bureau." Patrolman Zambarano testified that he proceeded to look where she pointed and "found a gun placed in a holster on top of the bureau underneath the clothing." The witness also testified that the officers searched the area where the gun was found and discovered .38-caliber bullets "on a bureau or in a bureau next to the gun" in defendant's bedroom. However, the police did not seize the firearm at this time. Rather, the Bureau of Criminal Identification (BCI) was summoned to 19 Pumgansett Street to photograph the evidence;

---

[3] In order to differentiate between Stephanie Kruwell and Samantha Kruwell, we shall refer to each witness by her first name only. In doing so, we intend no disrespect.

additional detectives entered the home and took photographs of both the firearm in defendant's bedroom and a can of pepper spray that had been discovered in the trash bin.

Sergeant Aspinall also testified at the suppression hearing; he said that he was the officer in charge that evening and participated in the search. This witness testified that his first encounter with Stephanie was at the house after defendant had been handcuffed and placed in the cruiser. He testified that, as he approached the house, he encountered a white male subject, later identified as Nathan Spardello, in the front doorway. Because Sgt. Aspinall "didn't like the way [Nathan] was standing above" him on the step, he had Nathan come down the stairs and "passed him on to a patrol officer," who was nearby, to be patted down. According to Sgt. Aspinall, Stephanie then "responded to the doorway." She stood inside the doorway, while he was "talking to her from the outside." Although the witness recalled that there may have been some pit bulls in the home, this was not "an issue since I was outside of the house." He testified that he "asked [Stephanie] specifically what had gone on this evening in front of her house." Stephanie told the sergeant that white girls were in a fight in front of her house, at which point, the sergeant returned to the cruiser where defendant was situated, to try to clarify what had transpired. At that point, he learned from a radio call that pepper spray may have been used in the incident. According to the sergeant's testimony, he wanted to talk to Stephanie again, so he returned to the doorway and "[o]pen[ed] the screen door to get her attention." According to the sergeant, Stephanie invited him in. The sergeant admitted that he did not ask Stephanie if she lived in the house, but he "assumed" that she lived there. He testified that, during their conversation, Stephanie was taking care of a young child who was "running around the house, and she was trying to take care of that while talking to me." Although he did not have much

contact with Samantha, he recalled that she was also watching the child, who was "going in and out of the house."

Sergeant Aspinall indicated that, when he asked Stephanie if there was pepper spray in the house, her response was no, but that "we could look around." According to the sergeant, at that point in the investigation, they were looking for pepper spray. Sergeant Aspinall testified that he immediately went to the trash bin, opened the lid, and discovered the can of pepper spray on top of the trash. He then confronted Stephanie, stating, "I know there's a firearm in this house. Could you tell me where the gun is?" According to the witness, Stephanie responded, "Yes. I'll go get it for you." Sergeant Aspinall stopped her and told her that "she could point it out to [Patrolman Zambarano] so that he could grab it." Patrolman Zambarano accompanied Stephanie into the bedroom and notified Sgt. Aspinall that there was a firearm in defendant's bedroom. Sergeant Aspinall called in BCI detectives to take photographs. After the BCI detectives entered the home and took photographs of the weapon, it was seized. There was no warrant. Throughout this period of time, defendant—who was the owner of the house and in whose bedroom the gun had been found—was in the back seat of a police cruiser; at no point did the officers ask defendant for consent to enter his home and to search the dwelling; nor did the officers consider utilizing a consent to search form. When Sgt. Aspinall was asked whether he sought permission to search the house or whether Stephanie offered, Sgt. Aspinall responded, "I believe she offered."

Stephanie testified at the suppression hearing and disputed this sequence of events. She testified that she does not live at 19 Pumgansett Street, but rather is a resident of North Providence. However, on July 31, 2007, at approximately 9 p.m., she was with defendant at his home when suddenly she heard a "ruckus going on in front of the house" and noticed a large

- 5 -

light being shined into the windows of the home. The defendant went outside to investigate and, after he did not return for a period of time, Stephanie went outside and found him handcuffed in the back seat of a police cruiser. Stephanie testified that the officers never asked her what happened, nor did they ask her whether there were any firearms in the house, or whether they could enter the home; rather, the officers "tried to walk right in the house." Stephanie testified that she informed the officers that they could not go into the home because there were dogs on the premises and "[t]he dogs bite," and one of the officers responded, "[p]ut the dogs away before I shoot them." The officers entered the home and began to look around. According to Stephanie, one of the officers looked through the kitchen area, including the trash bin, and found the pepper spray; he then walked toward what she described as the spare bedroom. The officer pointed to the closed door of the spare bedroom and asked what was behind the door. The officer then opened the door, went inside, and looked around. The officer then pointed toward the next closed door, asking what was behind it. Stephanie replied that it "was [defendant's] bedroom." The officer entered defendant's bedroom and "went through a few drawers, laundry basket, [and] moved clothing that was on top of an armoire." Stephanie denied ever leading the policemen into defendant's bedroom and pointing out the location of a firearm. Samantha also recounted a similar series of events—that the officers entered the home without permission and "were searching through [defendant's] room."

At the close of the hearing, the Superior Court justice concluded that the officers "did not ask for consent" to enter into the home, but that "[t]his is not really a consent-to-search case." Nor was the Superior Court justice of the opinion that he was confronted with an individual clothed with the apparent authority to consent to the entry and search of defendant's home, such that the seminal case of Illinois v. Rodriguez, 497 U.S. 177 (1990) applied to these facts. The

- 6 -

Superior Court justice found that "in the first instance[,]" the police were responding to an emergency situation and, therefore, "were lawfully at the premises." He rejected, as not credible, Stephanie's testimony that "the police barged into the house uninvited." Rather, he concluded that the police believed that Stephanie lived in the house, and "the credible evidence is that she invited them in, beckoned them to come in." The Superior Court justice also declared that the police "had not yet recovered a firearm and knew the firearm had to have been in the house." And, after Sgt. Aspinall found the pepper spray, it was clear that Stephanie had lied to the police, and it was therefore "proper and appropriate" for Sgt. Aspinall to ask "[w]here's the gun?," "particularly when you have a three-year-old running around the house." The Superior Court justice determined that it was Stephanie who pointed to the area where the gun was found and that "the police would have been foolish and derelict in their duty not to be doing what they were [doing]." Citing this Court's opinion in State v. Portes, 840 A.2d 1131 (R.I. 2004), the Superior Court justice concluded as follows:

> "[T]here were circumstances present in the case before me that certainly were exigent to the point where the cops had to find that gun, and knew there was a firearm. And, you have a youngster running around in the house. Shots had recently been fired, the gun was not accounted for and there had been a melee recently just before the cops arrived."

The Superior Court justice denied defendant's motion to suppress; and, after a jury trial, defendant was convicted on three counts of assault with a dangerous weapon and one count of carrying a pistol without a license.[4] The defendant timely appealed his conviction to this Court.

---

[4] The defendant was sentenced to eight years, with one year to serve, and seven years suspended with probation on each of the four charges, to be served concurrently.

**Standard of Review**

"When confronted with a decision denying a motion to suppress evidence, the Supreme Court accords deference to a trial justice's findings of historical fact." State v. Casas, 900 A.2d 1120, 1129 (R.I. 2006) (citing State v. Aponte, 800 A.2d 420, 424 (R.I. 2002)). However, when we are tasked with reviewing an alleged violation of a constitutional right, this Court undertakes a de novo review of the record in order to independently determine whether the rights of the accused have been violated. Id.; see also State v. Gonzalez, 136 A.3d 1131, 1145 (R.I. 2016) ("[W]hen this Court reviews 'an alleged violation of a defendant's constitutional rights, this Court must make an independent examination of the record to determine if [the defendant's] rights have been violated.'" (quoting State v. Harrison, 66 A.3d 432, 441 (R.I. 2013))).

"When called upon to review a trial justice's denial of a motion to suppress on Fourth Amendment grounds, our task is to review the record to determine, based on the totality of the circumstances, whether the evidence sought to be suppressed was obtained in violation of the constitutional prohibition against warrantless searches and seizures." State v. Barkmeyer, 949 A.2d 984, 995 (R.I. 2008) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).

**Analysis**

Before this Court, defendant argues that the Superior Court justice erred in denying his motion to suppress the incriminating evidence obtained during a warrantless entry and subsequent search of his dwelling. The defendant disputes the existence of exigent circumstances and contends that the warrantless entry and search violated the Fourth Amendment to the United States Constitution and article 1, section 6 of the Rhode Island Constitution.

- 8 -

Although acknowledging that the Superior Court justice rejected the theory that consent based upon apparent authority justified the search, the state nonetheless argues that we affirm the denial of the motion to suppress on the basis of apparent authority. The state contends that Stephanie had the apparent authority to invite the officers into the residence, and that therefore, this search was in compliance with the Fourth Amendment. In addition, the state argues that the Superior Court justice properly concluded that there were exigent circumstances—an emergency—which justified the warrantless search of defendant's home and seizure of the firearm from his bedroom.

It has long been recognized that a warrantless entry by members of law enforcement into a person's home, whether for an arrest or a search, is prohibited by the Fourth Amendment, in the absence of one of the specific and carefully delineated exceptions to the warrant requirement. See Portes, 840 A.2d at 1136. The starting point for analyzing whether the evidence seized during the warrantless search of defendant's home is admissible under the Fourth Amendment must begin with a determination of whether the entry by the responding officers was justified as falling within an exception to the warrant requirement. Id.

It is well-established that the analysis that is undertaken when law enforcement relies on the apparent authority of a consenting party "is not that they always be correct, but that they always be reasonable." Rodriguez, 497 U.S. at 185. We undertake this examination in the face of the undisputable facts that neither Stephanie nor Samantha lived in the home; they were not authorized to consent to a search of the premises; and, after defendant was placed in custody, the officers did not ask of anyone if they lived in the home.

**Warrantless Entry**

The Fourth Amendment to the United States Constitution clearly provides for "[t]he right of the people to be secure in their * * * houses * * * against unreasonable searches and seizures." From this amendment derives one of the most fundamental principles of constitutional jurisprudence—that entries and "searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are <u>per se</u> unreasonable * * * subject only to a few specifically established and well-delineated exceptions." <u>Duquette v. Godbout</u>, 471 A.2d 1359, 1362 (R.I. 1984) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)). It is equally understood that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstance, that threshold may not reasonably be crossed without a warrant." <u>Gonzalez</u>, 136 A.3d at 1146 (quoting <u>Payton v. New York</u>, 445 U.S. 573, 590 (1980)).

The warrant requirement serves to guard the privacy and sanctity of the home from "zealous" police officers "thrust[ing] themselves into a home" while ardently "engaged in the often competitive enterprise of ferreting out crime." <u>Johnson v. United States</u>, 333 U.S. 10, 13, 14 (1948). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006) (citing <u>Flippo v. West Virginia</u>, 528 U.S. 11, 13 (1999); <u>Katz</u>, 389 U.S. at 357). This Court consistently has declared that these exceptions are "narrowly defined and jealously guarded." <u>State v. Beaumier</u>, 480 A.2d 1367, 1373 (R.I. 1984).

Voluntary consent by a person authorized to grant consent is one of the exceptions to the warrant requirement. <u>See</u> <u>State v. Linde</u>, 876 A.2d 1115, 1125 (R.I. 2005). Indeed, third-party consent by a person with authority to consent is a valid tool for the police and prosecutors. However, "the validity of third party consent to a search must be applied cautiously to prevent

erosion of Fourth Amendment protections." Id. at 1125 (quoting State v. Farrell, 443 A.2d 438, 442 (R.I. 1982)). The state bears the burden of establishing valid consent by a preponderance of the evidence. See Casas, 900 A.2d at 1134.

## Apparent Authority

Our careful examination of the record before us leads us to reject the state's contention that Stephanie's purported consent justified the warrantless entry and subsequent search of defendant's home. "A third party's consent to [an entry or] search is valid if that person has either the 'actual authority' or the 'apparent authority' to consent to [entry and] a search of that property." Linde, 876 A.2d at 1125 (quoting United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004)). In order for apparent authority to consent to serve as a justification for a warrantless entry and search, the state bears the burden of proving that the officer reasonably believed that the person who invited the officer into the dwelling, or permitted a search, was authorized to do so, and it is discovered later that the consenting party lacked the authority to consent. See Barkmeyer, 949 A.2d at 999-1000 ("[T]he linchpin of apparent authority is evidence that the police officer entered and/or searched the premises under the reasonable, but mistaken, belief that the person consenting to such entry and/or search had the actual authority to do so." (citing Rodriguez, 497 U.S. at 186)). In order to establish apparent authority to consent to a warrantless entry and search, the state must demonstrate by a preponderance of the evidence the factors that were actually relied upon by the police.

Crucial to an examination of apparent authority, "'is whether, based on the information in the officers' possession, they reasonably believed' that the consenting individual had the authority to consent to a[n] [entry or] search." Barkmeyer, 949 A.2d at 1000 (emphasis added

- 11 -

and emphasis omitted) (quoting United States v. Meada, 408 F.3d 14, 22 (1st Cir. 2005)). We look to the totality of the circumstances.

The record before this Court fails to establish any factors upon which the officers could reasonably conclude that Stephanie lived in the home. Stephanie was described at various times as defendant's girlfriend or fiancée. The officers testified that they simply assumed that she lived in the dwelling and they made no inquiry to satisfy themselves that she actually lived there. After defendant was placed in custody, there were several adults and a young child remaining in the house. The officers failed to ask who, if anyone, lived in the house, and they did not ask anyone for identification. Sergeant Aspinall and Patrolman Zambarano testified that they had no real interaction with the other adults. When the Superior Court justice asked Patrolman Zambarano, "[w]hat led you to believe that [Stephanie] lived there?," the patrolman responded, "Just assumption, I guess." Similarly, Sgt. Aspinall also testified that, because Stephanie referred to the residence as "her house" when she came outside to speak to the officer, he "assumed it was [Stephanie's] house." Although the state points out that Stephanie was defendant's fiancée and that she was familiar with defendant's dogs as factors that support the officers' conclusions, there was no evidence produced to suggest that the officers relied on these factors.

This Court recognizes that, in the context of apparent authority, "room must be allowed for some mistakes on [the officer's] part." Rodriguez, 497 U.S. at 186 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). However, "the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." Id. (emphasis added) (quoting Brinegar, 338 U.S. at 176). An assumption, in the absence of factors that would lead an experienced police officer to reach such a conclusion, is woefully inadequate and does not

lead to a reasonable judgment. Thus, we agree with the Superior Court justice that this search cannot be justified on the basis of apparent authority to consent. The record is devoid of any facts upon which the officers could formulate a reasonable belief that Stephanie was clothed with apparent authority sufficient to invoke the consent exception to the warrant requirement.

## Exigent Circumstances

We also reject the Superior Court justice's conclusion that exigent circumstances were present in this case because there was "a youngster running around in the house[,] [s]hots had recently been fired, [and] the gun was not accounted for * * *." "For this Court to conclude there was an exigency, the 'ultimate test is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" Gonzalez, 136 A.3d at 1151 (quoting United States v. Adams, 621 F.2d 41, 44 (1st Cir. 1980)). In demonstrating a compelling and urgent necessity sufficient to circumvent the constitutional mandate of a warrant, the police "bear a heavy burden[.]" Id. (quoting Welsh v. Wisconsin, 466 U.S. 740, 749 (1984)); see also id. ("[B]efore agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." (emphasis added) (quoting Welsh, 466 U.S. at 750)).

Of course, facts that were not known to the officer at the time of the warrantless entry can never support a finding of exigent circumstances. In passing on the question, we limit our focus to the facts known to the police at the time they enter the dwelling. See Gonzalez, 136 A.3d at 1151-52. "[T]he police [must] have an objective, reasonable belief that a crisis can only be avoided by swift and immediate action." Id. at 1151 (quoting State v. Gonsalves, 553 A.2d 1073, 1075 (R.I. 1989)). This Court remains ever "mindful of the admonition of the United

- 13 -

States Supreme Court to the effect that '[w]hen an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some <u>real immediate and serious consequences</u> if he postponed action to get a warrant.'" <u>Id.</u> (emphasis added) (quoting <u>Welsh</u>, 466 U.S. at 751).

This Court previously has set forth specific examples of circumstances that were sufficiently exigent to overcome the warrant requirement. Those circumstances include: "law enforcement's need to provide emergency assistance to an occupant of a home, * * * engage in 'hot pursuit' of a fleeing suspect, * * * enter a burning building to put out a fire and investigate its cause, * * * [and] prevent the imminent destruction of evidence." <u>Gonzalez</u>, 136 A.3d at 1164 (quoting <u>Missouri v. McNeely</u>, 133 S.Ct. 1552, 1558-59 (2013)). We have also declared that exigent circumstances exist:

> "When evidence is likely to be lost, destroyed, or removed during the time required to obtain a warrant and when, because of the circumstances, it is difficult to secure a warrant, a warrantless entry and search may be justified. This exception also encompasses the situation in which police believe a person within requires immediate assistance or other victims or intruders may still be present." <u>State v. Jennings</u>, 461 A.2d 361, 366 (R.I. 1983).

In <u>Gonzalez</u>, 136 A.3d at 1152, we were faced with the constitutionality of a warrantless search of the defendant's residence and subsequent seizure of a firearm, after the police received a report that the defendant had shot and killed somebody. The police testified that they knew the defendant was inside the residence, was armed, and that "there were concerns about destruction of evidence, and that there was a possibility of harm to the public or to [the defendant] himself." <u>Id.</u> None of those factors carried the day. Although this case is distinguishable from <u>Gonzalez</u> in regard to the amount of time that elapsed between the 9-1-1 call and the warrantless entry, the record before us is wholly devoid of <u>any</u> testimony whatsoever suggesting an urgent need to

- 14 -

search the dwelling or any real and serious consequence that could result from a delay in order to secure the premises and obtain a warrant.

It is well-established that, in considering the reasonableness of a warrantless search, "[t]he proper line of inquiry is whether the police reasonably believed, relying upon facts known by them at the time * * * that the warrantless intrusion was necessary to preserve life or avoid serious injury." Gonsalves, 553 A.2d at 1075-76. The testimony of the intruding officer provides the court with insight into the officer's motivation for the entry and, therefore, provides the basis for the court's conclusion that exigent circumstances support the intrusion. See, e.g., State v. Morin, 68 A.3d 61, 67 n.11 (R.I. 2013) ("In most cases, the testimony of the arresting officer should provide the basis for the conclusion that he or she reasonably believed that exigent circumstances existed.").[5]

The record before this Court demonstrates that neither officer testified that he was concerned about the unsecured firearm or that he was faced with an emergency. Neither officer testified that he was concerned that the underlying dispute may reignite or that he suspected that Samantha or Stephanie may pursue their earlier aggressors armed with the unsecured firearm. Neither officer testified that time was of the essence or that their unfolding investigation was potentially volatile. Had either officer testified to any of these concerns, or pointed to any reason

---

[5] The full footnote reads as follows:

> "In most cases, the testimony of the arresting officer should provide the basis for the conclusion that he or she reasonably believed that exigent circumstances existed. Under the facts of this case, we conclude that, although Officer Green did not testify at the suppression hearing, 'the circumstances, viewed objectively, justify [his] action[s]' because Brandstromskelding's testimony sufficiently demonstrated the existence of exigent circumstances." State v. Morin, 68 A.3d 61, 67 n.11 (R.I. 2013) (citing Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006)).

- 15 -

justifying the warrantless search of defendant's home, our analysis would hinge on that testimony. However, where the record is bereft of any police testimony demonstrating exigency, hypothesizing about what the officers "could have believed," beseeches the distorting effects of hindsight and is erroneous. See Welsh, 466 U.S. at 751 ("When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." (quoting McDonald v. United States, 335 U.S. 451, 460 (1948))); see also DeMayo v. Nugent, 517 F.3d 11, 17 (1st Cir. 2008) ("[O]fficers must be able to point to specific facts in the record to justify a warrantless entry based on exigent circumstances * * *."); Hegarty v. Somerset County, 53 F.3d 1367, 1375 (1st Cir. 1995) ("We must isolate all reasonably reliable information collectively known to the officers at the time their challenged conduct occurred, without indulging hindsight[.]" (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991))).

After a thorough review of the record in this case, we are unable to discern any conceivable facts demonstrating that the officers possessed a compelling and urgent need to enter defendant's home without the accompaniment of a warrant. The record clearly establishes that, at the time of the warrantless entry, defendant—the lone suspect—was in custody in the back seat of a police cruiser. No suspect was attempting to flee the scene; there was no threat of an imminent destruction of evidence; there was no need to provide emergency assistance to anyone in the home; and there were no other suspects, intruders, or victims on the premises. See Gonzalez, 136 A.3d at 1151; see also Jennings, 461 A.2d at 366. Indeed, the police did not even notice the child until after they were in the home, and they paid scant attention to the child in any event. A passing observation that there may have been a child "running around the house" will not support a warrantless search based on an emergency.

Similarly there is no evidence supporting the Superior Court justice's conclusion that the officers felt immediate action was necessary to recover the firearm. Nor are we persuaded that the presence of a firearm gives rise to an exigent circumstance sufficient to circumvent the warrant requirement. The fact that there may have been a firearm somewhere in the residence does not, by itself, rise to the level of exigency necessary to surpass the warrant requirement. See State v. DeLaurier, 533 A.2d 1167, 1169 (R.I. 1987) ("The Supreme Court of the United States has clearly prohibited the warrantless search of a dwelling based only on probable cause to believe the dwelling contains contraband" (citing Payton, 445 U.S. at 587)); see also State v. Alexander, 433 A.2 965, 967 (R.I. 1981) ("Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant." (quoting Vale v. Louisiana, 399 U.S. 30, 34 (1970))). The prudent course for the police is to secure the premises and obtain a warrant. See United States v. Martins, 413 F.3d 139, 145 (1st Cir. 2005) (police conducted a protective sweep of the residence, secured the residence, and then obtained a search warrant to search the premises).

Furthermore, it remains "important to ensure that the intrusion was not merely a pretext to * * * search to seize evidence." Portes, 840 A.2d at 1136 (citing Duquette, 471 A.2d at 1363). "The impetus of the [warrantless] entry must be to preserve life and property." Id. Because this excuses what otherwise would be a violation of the Fourth Amendment, the search "must be limited in scope and purpose." Jennings, 461 A.2d at 367 (citing Mincey v. Arizona, 437 U.S. 385, 393 (1978)). When the area is secure and the danger is no longer present, the emergency is over, and the search must cease. Id. ("When the security check has been completed, the area is secured, and there is no longer any danger of the loss or destruction of evidence, the search must cease. Any further intrusion is a violation of the Fourth Amendment.").

The record before us is devoid of any real immediate and serious consequences that may have resulted had the police delayed entry into defendant's residence to obtain a warrant. Therefore, in the absence of exigency, the officers had ample time to obtain a warrant; their failure to do so cannot be excused. See Jennings, 461 A.2d at 367.

Because the state failed to overcome the presumption of unreasonableness that accompanies every warrantless entry into a home, we hold that the warrantless entry and search of defendant's home was in clear violation of his Fourth Amendment rights. To hold otherwise would, essentially, "[a]llow[] the police to enter the home of every * * * suspect without first obtaining the approval of a disinterested judicial officer, in effect, '* * * reduc[ing] the [Fourth] Amendment to a nullity and leav[ing] the people's homes secure only in the discretion of police officers.'" Gonzalez, 136 A.3d at 1164 (quoting Johnson, 333 U.S. at 14). "The public has a right to be protected from illegal searches and seizures * * *." Casas, 900 A.2d at 1135. This liberty is one that must be afforded to "those suspected of being or known to be, offenders as well as to the innocent." Id. (quoting State v. Robinson, 658 A.2d 518, 522 (R.I. 1995)). Accordingly, the evidence in this case must be suppressed.

**Harmless Error**

Finally, we disagree with the state that the Superior Court justice's admission of the firearm amounted to harmless error because the firearm served only as "cumulative evidence," corroborating the testimony of the state's three witnesses.

Harmless error is recognized to be an error that "in the setting of a particular case [is] so unimportant and insignificant that [it] may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." State v. Lopez, 943 A.2d 1035, 1043 (R.I. 2008) (quoting Chapman v. California, 386 U.S. 18, 22 (1967)). This Court has

- 18 -

acknowledged that "whether or not an error is harmless turns on whether it is reasonably possible that the error contributed to the conviction." Id. (citing State v. Lachapelle, 112 R.I. 105, 112-13, 308 A.2d 467, 471 (1973)).

In order to effectively conduct a harmless error analysis, the particular evidence must be "quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." State v. Humphrey, 715 A.2d 1265, 1276 (R.I. 1998) (quoting Brecht v. Abrahamson, 507 U.S. 619, 629 (1993)). In cases in which there is "overwhelming additional evidence indicative of [a] defendant's guilt," this Court has determined that erroneously admitted evidence constituted harmless error. State v. Perez, 882 A.2d 574, 590 (R.I. 2005).

However, judicial error "in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot * * * be conceived of as harmless." Lachapelle, 112 R.I. at 113, 308 A.2d at 471 (quoting Chapman, 386 U.S. at 23-24). The burden rests with the state "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Gonzalez, 136 A.3d at 1156 (emphasis omitted) (quoting Chapman, 386 U.S. at 24).

This is a case in which the accused was convicted of three counts of assault with a dangerous weapon, to wit, a firearm, and one count of carrying that firearm without a license—charges that require the state to prove beyond a reasonable doubt that defendant had control over a firearm.

We are satisfied that the firearm was a critical piece of evidence in the case. The state's three key witnesses each testified that they observed the defendant with the gun. However, one witness explained that she did not actually observe the defendant firing the weapon. An eyewitness neighbor testified that he witnessed the altercation on Pumgansett Street and that the defendant had nothing in his hands. He testified that the gunshot came from the direction of

Douglas Avenue. In the face of this conflicting testimony, we cannot conclude that the admission of the unlawfully seized evidence was harmless beyond a reasonable doubt.

## Conclusion

For the reasons set forth herein, we vacate the judgment of the Superior Court. The record shall be remanded to the Superior Court for a new trial.

**Justice Indeglia, with whom Justice Robinson joins, dissenting.** Although we agree with the majority's conclusion that, in view of the ambiguous nature of the facts known to the police, the consent exception to the Fourth Amendment to the United States Constitution and article 1, section 6 of the Rhode Island Constitution did not justify a warrantless search, especially into the defendant's bedroom, we vigorously disagree with its holding that the officers' actions could not be upheld under the exigent-circumstances exception to the warrant requirement. In our view, the circumstances that confronted the officers on July 31, 2007, called for emergency action; and, for that reason, we voice our respectful but unequivocal dissent.

In discerning whether an exigency existed, "[t]he police [must] have [had] an objective, reasonable belief that a crisis can only be avoided by swift and immediate action." State v. Gonsalves, 553 A.2d 1073, 1075 (R.I. 1989) (quoting Duquette v. Godbout, 471 A.2d 1359, 1363 (R.I. 1984)). Such is the case before us.

While the majority has outlined the facts of this case in detail, we highlight those facts that are reflective of the exigency that the officers faced. Around 9:30 p.m. on July 31, 2007, officers responded to a radio dispatch concerning shots fired on Pumgansett Street in Providence. When one patrol arrived at the scene, the gunfire was so recent that the officers testified that the smell of gunpowder still permeated the air. An officer also saw broken glass in the street. At the

same time, another patrol was dispatched to a nearby Walgreens pharmacy, where a person claiming to be a victim said that defendant had shot out the back window of his car and had beaten up his girlfriend. It was also learned that one of the victims had been pepper-sprayed. Locating defendant's house with the victim's assistance, officers knocked on the door at 19 Pumgansett Street and defendant answered. Seemingly intoxicated and noticeably uncooperative, he acknowledged that there had been a fight outside, but he was of little help beyond that. One of the officers, Sgt. Aspinall, conducted a show-up of defendant, with the witness identifying defendant as the person who had discharged the firearm. Although the officers had identified defendant as the suspect who allegedly fired the gun, the weapon and the pepper spray involved in the altercation had not yet been found or accounted for.

Following defendant's detention, the officers' investigative efforts determined that a domestic dispute was at the heart of the incident. Samantha Kruwell, who was present at defendant's house, told the officers that there had been a fight between her and her ex-boyfriend immediately outside the Pumgansett Street house.[1] Officers observed that Stephanie Kruwell, defendant's fiancée and Samantha's mother, had a bloody cut on her hand from her attempt to break up the fight.

Stephanie and Samantha were not entirely forthright in their responses to the officers. Apart from her recounting of that night's events that conflicted with defendant's, Stephanie initially told the officers that there were no guns in the house. She then reversed course and admitted that there was a gun, and, as the trial justice found, she allowed the officers to enter the home to determine its whereabouts. It was at this point that the officers saw "a young child running around the house," as Stephanie and Samantha tried to attend to him. After being

---

[1] The ex-boyfriend was later identified as Nathan Spardello.

directed by Stephanie to defendant's room, the officers conducted a brief, limited search, which turned up a gun under a pile of clothing along with several loose bullets. The Bureau of Criminal Identification unit was called to retrieve the gun.

We agree that "[a]t the core of the privacy protected by the Fourth Amendment is the right to be let alone in one's home." Sutterfield v. City of Milwaukee, 751 F.3d 542, 550 (7th Cir. 2014). Nevertheless, we afford protection to an officer's "[o]n the spot reasonable judgments * * * about risks and dangers * * * ." Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999). "Deference to those judgments may be particularly warranted in domestic disputes" where "violence may be lurking and explode with little warning." Id. An officer is not required to wait until the anticipated danger—whether to himself or herself or to the public—comes to fruition. See Brigham City, Utah v. Stewart, 547 U.S. 398, 406 (2006) (Brigham City) ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties * * *."); see also Mincey v. Arizona, 437 U.S. 385, 392 (1978) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.") (quoting Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) (opinion of Burger, J.)).

The instant case presents such a setting. The defendant's arrest did very little to address the underlying domestic dispute that served as the catalyst to the fight and ultimate shooting. Indeed, his arrest may have added more fuel to the fire. Although the officers were unfamiliar with Samantha and Stephanie, they knew that they had been recent active participants in a fight in the street. They saw Stephanie's bloodied hand from the altercation and they learned from Samantha that she had been in the fight. Leaving the scene without seeking the gun, the officers would have left Samantha and Stephanie with the means to pursue their earlier aggressors.

Whether they would have acted upon such a motivation is not something the officers could have ruled out based on the information known to them at that time. As the trial justice noted, "Frankly, the police would have been foolish and derelict in their duty not to be doing what they were."

Moreover, "[w]arrantless entries are justified to protect not only victims and fellow police officers, but also innocent bystanders and suspects themselves." Gonsalves, 553 A.2d at 1075; see also State v. Kendrick, 100 A.3d 821, 837 (Conn. 2014) (deeming reasonable the police entrance into the bedroom under the exigent-circumstances doctrine based on the officers' reasonable belief "that the entry was necessary for their own protection, as well as the protection of others in the apartment"). Exigent circumstances are found when an officer anticipates that someone in the home, whether a child or an adult, will be harmed by a firearm. See, e.g., United States v. Hardy, 52 F.3d 147, 149 (7th Cir. 1995) (holding that exigent circumstances justified the warrantless entry and search of the defendant's motel room where the police officers reasonably believed that the defendant, with a sawed-off shotgun, was a threat to the officers and the women and children in the room); State v. Christensen, 663 N.W.2d 691, 696 (S.D. 2003) ("[T]he house was unlocked and unwary children could have entered to take possession of loaded firearms.").

Here, the officers could reasonably have believed that it was necessary to secure the gun before either the heated domestic dispute reignited or, perhaps worse, the young child located the unsecured firearm. See United States v. Janis, 387 F.3d 682, 688 (8th Cir. 2004) (upholding a warrantless search of a home for a gun that discharged and injured the defendant because the officer testified that he had concerns that a loaded weapon was "out in the open" and "still at the scene"); United States v. Antwine, 873 F.2d 1144, 1145-47 (8th Cir. 1989) (During a protective

- 23 -

sweep following the arrest of a robbery suspect who brandished a gun, an officer found a young boy and girl inside the home. Denying the motion for suppression, the court stated that "a warrantless seizure of a weapon may be considered 'reasonable' within the meaning of the Fourth Amendment when justified by an officer's legitimate concern for someone's safety.").

The majority opinion suggests that a subjective analysis is employed when determining whether the exigent-circumstances exception vindicates a warrantless search. Specifically, it states that: "The testimony of the intruding officer provides the court with insight into the officer's motivation for the entry and, therefore, provides the basis for the court's conclusion that exigent circumstances support the intrusion." (Emphasis added.) This conclusion, however, misconstrues the controlling standard for assessing whether a warrantless search is reasonable under the Fourth Amendment because the officer's motivation is of no moment. In fact, the United States Supreme Court has explicitly rejected this approach. See Brigham City, 547 U.S. at 404 (setting forth the United States Supreme Court's explicit view that, for purposes of the Fourth Amendment's reasonableness analysis, "[t]he officer's subjective motivation is irrelevant"); Whren v. United States, 517 U.S. 806, 813 (1996) (explaining the United States Supreme Court's unwillingness "to entertain Fourth Amendment challenges based on the actual motivations of individual officers").

In Brigham City, 547 U.S. at 406-07, the United States Supreme Court held that the exigent-circumstances exception justified the police officers' warrantless entry. The defendant in that case, which involved an altercation observed at a 3 a.m. house party, argued that police entry was unreasonable based on the officers' subjective motivations, asserting that they "were more interested in making arrests than quelling violence." Id. at 400-02, 404. In rejecting this argument, the Supreme Court made clear that the Fourth Amendment's reasonableness analysis

"has nothing to do with discerning what is in the mind of the individual officer conducting the search"; id. at 405; rather, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" Id. at 404 (quoting Scott v. United States, 436 U.S. 128, 138 (1978)); see also Bond v. United States, 529 U.S. 334, 338 n.2 (2000) ("The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment. * * * [T]he issue is not his state of mind, but the objective effect of his actions."); Graham v. Connor, 490 U.S. 386, 397 (1989) ("[T]he subjective motivations of the individual officers * * * ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment.").

By shifting the focus to "the officer[s'] motivation for the entry," the majority has erroneously applied a subjective analysis to determine whether an exigency existed. When the circumstances are examined objectively, however, the officers' entry was clearly justified under the exigent-circumstances exception. State v. Morin, 68 A.3d 61, 67 n.11 (R.I. 2013) (citing Brigham City, 547 U.S. at 404). Although the officers did not specifically state that they were "faced with an emergency" or "concerned," they did testify about the actual circumstances that confronted them: shots had recently been fired; there had been a street fight between Samantha and her ex-boyfriend; someone had been pepper-sprayed; and the officers had been told that there was a firearm in the house where, as the majority noted, a young child "was running around." Here, "the circumstances, viewed objectively, justify [the officers'] action[s]." Id. (quoting Brigham City, 547 U.S. at 404).

Finally, we do not agree with the majority that the officers should have secured the premises and somehow removed the occupants from the house while they went about seeking a

search warrant. Rather, this case was "defined by a time-urgent need to act that [made] resort to the warrant process impracticable." Sutterfield, 751 F.3d at 559. It was not "early on a weekday afternoon" when "'the amount of time necessary to obtain a warrant' likely would have been minimal"; rather, it was "late in the evening * * * when officers might not have had ready access to a magistrate." United States v. Menchaca-Castruita, 587 F.3d 283, 294 (5th Cir. 2009) (quoting United States v. Rico, 51 F.3d 495, 501 (5th Cir. 1995)). As this Court stated in Gonsalves, 553 A.2d at 1076, "Swift action was imperative. Any delay in obtaining a warrant at one o'clock in the morning could have ignited an already volatile situation."

From our view, this case falls squarely within the applicability of the exigent-circumstances exception because the above-mentioned circumstances precisely demonstrate "such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." State v. Gonzalez, 136 A.3d 1131, 1151 (R.I. 2016) (quoting United States v. Adams, 621 F.2d 41, 44 (1st Cir. 1980)). "[P]olice are in the emergency service business and they usually have little or no time to leisurely consider their options or engage in protracted evaluation." Id. (quoting State v. Portes, 840 A.2d 1131, 1137 (R.I. 2004)). The United States Supreme Court has underscored that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Kentucky v. King, 563 U.S. 452, 466 (2011) (quoting Graham, 490 U.S. at 396-97). Because, in our view, the circumstances of this case compelled such an "allowance," we are confident that the trial justice's finding of exigency was correct. For that reason, we respectfully dissent.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Boghos Terzian. |
| **Case Number** | No. 2009-46-C.A.<br>(P2/07-4007AG) |
| **Date Opinion Filed** | June 23, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Jane M. McSoley<br>Department of Attorney General<br><br>For Defendant:<br><br>Matthew S. Dawson, Esq. |