June 29, 2022

**Supreme Court**

No. 2019-68-C.A.
(P1/12-3389A)

State               :

v.                 :

Christopher Jimenez.       :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                               :

Christopher Jimenez.            :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Long, for the Court.**  The defendant, Christopher Jimenez (defendant or Mr. Jimenez), appeals from a Superior Court judgment of conviction and commitment for one count of second-degree murder and one count of first-degree child abuse stemming from the abuse and death of his five-week-old daughter.  On appeal, Mr. Jimenez contends that the trial justice erred by denying his motions (1) to suppress a statement alleged to have resulted from an arrest made without probable cause, in violation of the United States and Rhode Island Constitutions; (2) to dismiss the indictment as vague, in violation of the United States and Rhode Island Constitutions; and (3) for new trial based on the state's alleged failure to prove the elements of the crime beyond a reasonable doubt.

For the reasons stated herein, we affirm the judgment of the Superior Court.

- 1 -

## Facts and Procedural History

In December 2012 Mr. Jimenez was indicted on three counts relating to the abuse and death of his infant daughter, Christina Jimenez (baby Christina). Count one alleged that Mr. Jimenez murdered baby Christina in the second degree, in violation of G.L. 1956 §§ 11-23-1 and 11-23-2. Count two alleged that Mr. Jimenez committed first-degree child abuse against the infant by infliction of serious bodily injury, in violation of G.L. 1956 § 11-9-5.3(b)(1), (d), (e), and (f).[1] Count three alleged that Mr. Jimenez committed a second count of child abuse against the infant by inflicting serious bodily injury, in violation of § 11-9-5.3(b)(2), (d), (e), and (f).

Prior to trial, defendant moved to suppress a formal statement he gave to the Providence police during the investigation into the abuse and subsequent death of baby Christina. The trial justice heard testimony and ultimately denied the motion to suppress. The defendant also moved to dismiss the indictment as unconstitutionally vague, a motion that the trial justice also denied after a hearing

---

[1] The indictment erroneously listed the applicable statutory subsections for count two as G.L. 1956 § 11-9-5.3(b)(2), (d), (e), and (f). However, prior to closing arguments, the trial justice granted the state's motion to correct the indictment to list the correct applicable subsections for count two, § 11-9-5.3(b)(1), (d), (e), and (f), a decision not challenged on appeal.

on the matter.  A bench trial was subsequently held over eight days in October 2016.

The evidence at trial revealed the following tragic facts.

Mr. Jimenez was the father of baby Christina, and her mother was Mayra

Gonzalez (Mayra).[2]  Mr. Jimenez and Mayra had a first child, a boy, who was two

months old when Mayra became pregnant with baby Christina.

Mayra testified that when she was about five months pregnant with baby

Christina, she and Mr. Jimenez were evicted from the apartment they had maintained

for about a year.  She, defendant, and their infant son moved to an apartment on

Congress Avenue in Providence, Rhode Island, with Mayra's parents, Maures and

Alejandhina Gonzalez,[3] and Mayra's three teenaged siblings.

It was a crowded living situation.  Mayra, Mr. Jimenez, and their infant son

shared one room.  Mayra, Alejandhina, and Maures each testified consistently that

defendant was very unhappy and isolated during the period leading up to and

immediately following baby Christina's birth.  They each testified that defendant

spent most of his time in the couple's bedroom, and that defendant did not have a

strong relationship with the Gonzalez family.  Alejandhina further testified that

Mayra and defendant fought with some frequency.  Mayra testified that defendant

---

[2] Throughout this opinion, we refer at times to members of the Gonzalez and Jimenez families by their first names, solely for the sake of clarity.  We intend no disrespect.
[3] There were inconsistencies in the record as to the proper spelling of both Alejandhina and Maures's names.  In this opinion we are using what we hope to be the correct spelling.

did not have a vehicle or a job, though Alejandhina and Maures testified that he sometimes left the apartment to go visit his own brother and sister.

On May 10, 2012, Mayra gave birth to a healthy baby girl, baby Christina, at Women & Infants Hospital of Rhode Island. Doctors discharged mother and baby two days later, with no complications.

However, at 4:26 a.m. on June 20, 2012, just five weeks after baby Christina was born, Mayra placed a 911 call reporting that baby Christina was not breathing. Mayra testified she had gone to bed at around 10 p.m. after feeding baby Christina and changing her diaper. She awoke early the next morning to see baby Christina on defendant's lap; Mayra described baby Christina as visibly dizzy and wobbly, with white "goo" coming out of her mouth. The defendant told Mayra he had dropped the infant; it was then that Mayra called for help. By the time she was outside waiting for an ambulance, baby Christina had stopped breathing.

Lieutenant Dennis Tucker, a firefighter and cardiac-level emergency medical technician employed by the Providence Fire Department, testified at trial that he arrived at the Congress Avenue apartment with his team, just five minutes after dispatch, to find Mayra on the street holding baby Christina and waiting for the rescue. Lieutenant Tucker took baby Christina and assessed that she was in full cardiac arrest; he began breaths and infant chest compressions. The rescue team transported baby Christina and her parents to Hasbro Children's Hospital (Hasbro),

- 4 -

continuing compressions and ventilation throughout the ambulance ride. While in transport, Lt. Tucker further observed that baby Christina's pupils were fixed and dilated, indicating to him that she had suffered a head trauma.

Christine Barron, M.D. testified as an expert witness and as one of the physicians who cared for baby Christina during the infant's time at Hasbro. Doctor Barron testified that when baby Christina arrived at Hasbro, she presented in full respiratory cardiac arrest. The infant was taken to a trauma room, where doctors resuscitated her heart by intubating her with an endotracheal tube. To ensure proper placement of the endotracheal tube, doctors ordered a chest x-ray, taken at 4:58 a.m. Radiologists immediately noted that baby Christina had at least ten rib fractures and a fracture to her left clavicle.

Mayra testified that, soon after their arrival at the hospital, doctors spoke with her to ascertain what had happened. She reported to the doctors that defendant had dropped baby Christina and that the baby had hit a table in descent and then hit the floor.

Doctor Barron testified that the physicians subsequently ordered CT scans of baby Christina's head and abdomen, along with other films and labs. The CT scan of baby Christina's head, taken at 5:32 a.m., showed that baby Christina had suffered significant head trauma—multiple fractures of her skull and swelling resulting from an injury to her brain. Doctors transported baby Christina to the Hasbro Pediatric

Intensive Care Unit for continued care, where she remained on life support. She had no pupillary reflex and no gag reflex: Her brain was unresponsive. Baby Christina never regained consciousness.

In the immediate aftermath of baby Christina's hospitalization, the Department of Children, Youth, and Families and the Providence Police Department began investigating the circumstances surrounding baby Christina's injuries. DCYF child protective investigator McKayla Dolan and Providence Police Department Detective Nancy Santopadre each testified at trial about the parallel investigations.

During the investigations, Mayra and defendant were separately transported to the Providence police station to give formal statements. Detective Santopadre testified at a pretrial hearing on defendant's motion to suppress that, while the parents waited at the police station, she arrived at the police station and marshaled the information at her disposal, speaking to fellow investigators, a representative of the attorney general's office, and the Hasbro physicians. Significantly, Det. Santopadre learned from the Hasbro physicians that baby Christina had sustained more than a dozen rib fractures, a clavicle fracture, a pelvic fracture, a lacerated liver, and four skull fractures, and that she had a scar on her chin. The detective also learned that the story Mayra and Mr. Jimenez had maintained until that point was not consistent with baby Christina's actual injuries: The injuries were far more extensive than could be produced by a fall, and the injury to baby Christina's brain

at the time of admittance was several hours older than had been reported by the parents.

Detective Santopadre testified that, at that point, she determined that Mr. Jimenez was a suspect in a crime. Detective Santopadre joined defendant in an interview room, informed him that the police suspected him to have committed child abuse, and read him his *Miranda* rights.[4] The defendant waived his rights, and he gave a formal interview in which he attempted to explain as accidents the numerous injuries baby Christina had sustained. After the interview, Mr. Jimenez was placed under arrest and charged with child abuse.

On July 7, 2012, baby Christina was taken off life support. She died that same day.

At trial, the state presented two expert witnesses to provide medical evidence, including Dr. Barron. Christina Stanley, M.D., the state medical examiner who performed the autopsy on baby Christina in July 2012, provided expert testimony at trial that confirmed Dr. Barron's testimony and provided more details. The medical evidence showed that baby Christina's injuries were catastrophic: During the little more than five short weeks in which baby Christina was alive and conscious, she had endured dozens of inflicted injuries—injuries that culminated in a head trauma dealt in the early-morning hours of June 20, 2012.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

The medical evidence established that baby Christina had sustained four skull fractures: one on her right frontal bone, one on her left parietal bone, and two on her right parietal bone. Further, she had sustained an injury to the brain itself, evidenced by significant edema, or swelling, of the brain, as well as a subdural hemorrhage (bleeding from the vessels on the surface of the brain), retinal hemorrhages (bleeding of the retinas), and two instances of retinoschisis (tearing of the retinal tissues from each other) of the right eye. The head trauma caused baby Christina to stop breathing, resulting in her subsequent descent into full cardiac arrest due to decreased oxygenation.

Importantly, Dr. Barron testified, to a reasonable degree of medical certainty, that baby Christina's head injury had occurred between 11 o'clock the night before and 4 o'clock on the morning of June 20, 2012. She testified that baby Christina's brain injury was at least a few hours old when doctors performed the initial imaging upon her admission to the hospital. The doctor further testified that baby Christina would have immediately exhibited progressively worsening symptoms upon infliction of the brain injury, but it would have taken a few hours for the edema to reach the stage that it had at the time those initial scans were performed. After reviewing statements that Mayra and defendant had given to police, Dr. Barron concluded that baby Christina had not sustained a head trauma as of 11 p.m. on June 19, 2012, but that by 4 a.m. the next day, the baby was showing significant

symptoms of brain injury, namely the wheezing or gurgling noises she exhibited and her subsequent descent into full cardiac arrest.

Doctor Barron testified unequivocally and with a reasonable degree of medical certainty that the brain injury that baby Christina had sustained would never happen in the normal care of an infant and was not consistent with a simple fall, defined as a fall from six to ten feet. Rather, the brain injury (encompassing the injury to the tissue and the injuries to the retina) was the result of significant rotational or "acceleration/deceleration forces"; shearing forces such as those seen in shaking; or significant, direct blunt-force trauma.

Both Dr. Barron and Dr. Stanley also testified to the significant bodily injuries baby Christina had sustained across the rest of her body. The evidence established that the infant had sustained twenty-eight rib fractures in various stages of healing, dated between two days and three weeks old. Thirteen of the rib fractures were posterior medial fractures, sustained by infliction of significant compression or squeezing forces. The evidence also revealed that baby Christina had five classic metaphyseal lesions (CMLs): at the femur above the right knee, on both legs below the knees, and at both ankles. According to the testimony at trial, CMLs are caused by shearing forces across the end of a growing bone; such forces are seen in twisting and wrenching of the extremities, or with flaring of the extremities in conjunction with significant acceleration/deceleration forces. Doctor Barron testified that a

CML is a "red flag" for inflicted injury, especially in a baby under one year old; the doctor testified that those injuries do not occur in the normal care of an infant, and they do not occur with typical accidental falls.

The doctors both testified that baby Christina also had several other injuries: a clavicle fracture, dated to be between two and ten days old; two pelvic fractures; a small laceration of the liver; fractures at both wrists, including a CML of the right wrist; and a buckle fracture in the left thumb, caused by hyperextension or forceful squeezing. Doctor Stanley testified that the liver laceration, pelvic fractures, and clavicle fracture were most likely caused by a compressive crushing injury.[5]

Doctor Stanley investigated the cause and manner of baby Christina's death and concluded that the cause of baby Christina's death was multiple blunt-force injuries. Specifically, she opined to a reasonable degree of medical certainty that the forces required to fracture baby Christina's skull also injured her brain, which was an independently fatal injury. Additionally, the multiple injuries of different ages made baby Christina a fragile infant; in particular, the rib fractures likely contributed to and quickened the decreased oxygenation that baby Christina had experienced, resulting in cardiac arrest. Moreover, Dr. Stanley concluded that the

---

[5] We add that Dr. Barron testified that lab results showed that baby Christina had normally formed and normally mineralized bones and had normal results for metabolic bone tests. In other words, baby Christina was not predisposed to fractures at all.

manner of baby Christina's death was homicide: Baby Christina could not have caused these injuries herself, and they were not accidental.

At the close of the state's case, the trial justice, with defendant's consent, granted the state's motion to dismiss count three pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. At the close of trial, the trial justice rendered a decision from the bench in which she found defendant guilty on the two remaining counts of the indictment.

The defendant thereafter moved for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The trial justice denied the motion. The trial justice subsequently sentenced defendant to life imprisonment for count one, second-degree murder for the death of baby Christina; and to fifteen years for count two, first-degree child abuse of baby Christina, to be served consecutively to the life sentence imposed for count one. Mr. Jimenez timely appealed. Further facts will be provided as they are germane to the discussion of the errors specified by defendant on appeal.

**Discussion**

The defendant assigns three errors on appeal. First, he contends that the trial justice erred by denying his motion to suppress the statement he made while at the police station, arguing that his statement was the fruit of an arrest not supported by probable cause, in violation of the United States and Rhode Island Constitutions.

Second, he contends that the trial justice erred by denying his motion to dismiss the indictment as unconstitutionally vague. Third, he contends that the trial justice erred by denying his motion for new trial, arguing that the state failed to prove the elements of the offenses beyond a reasonable doubt. We address each specification of error in turn.

**Motion to Suppress**

Mr. Jimenez contends the statement he gave at the Providence police station should have been suppressed because it was the fruit of an illegal seizure. He maintains that police, without probable cause, seized him within the meaning of the Fourth Amendment to the United States Constitution and article 1, section 6 of the Rhode Island Constitution from the time he was at the hospital and prior to the police bringing him to the police station. Accordingly, we consider whether the trial justice erred by failing to grant defendant's motion to suppress based on defendant's contention that the statement was the fruit of an illegal seizure.

As discussed previously, the trial justice held a hearing on defendant's motion to suppress the statement that he gave at the Providence police station. The trial justice heard testimony from Det. Santopadre and from defendant. Detective Santopadre testified that she arrived to work on the morning of June 20, 2012, and was immediately directed to report to Hasbro based on a police report that a child was in full cardiac arrest. Upon her arrival at Hasbro, around 8 a.m., she spoke with

- 12 -

physicians and learned that baby Christina was brought to the hospital in full cardiac arrest and with an injury to the head. She then spoke with the parents, starting with defendant. Detective Santopadre testified that defendant had reported to her that, early that morning, he picked baby Christina up in her receiving blanket and, in doing so, he dropped her. She testified that he further reported that he had heard the infant hit a piece of furniture on the way down.

After speaking with both of baby Christina's parents, Det. Santopadre testified, she was instructed to go to the Congress Avenue apartment to search for any evidence that might be seized. She testified that, before doing so, she had asked Mayra and defendant if they would go to the Providence police station voluntarily to give statements. She testified that both parents agreed to do so.

Because the parents had arrived at the hospital in the rescue, a patrol officer transported Mr. Jimenez in a patrol car and Mayra was transported separately. Detective Santopadre testified that, once at the police station, defendant was taken to a juvenile bureau interview room. She testified that he was not handcuffed, the door was unlocked, and she would periodically check on him to see if he needed anything.

As described previously, Det. Santopadre testified that it was at that point, back at the police station, that she learned the full extent of baby Christina's injuries,

- 13 -

determined that she suspected defendant of abusing baby Christina, and read defendant his *Miranda* rights prior to interviewing him.

The defendant also testified at the hearing on his motion to suppress. The defendant testified about sequential conversations with both police and doctors at Hasbro. He testified that, at some point, a detective entered the family room at the hospital and told him that he had to give a statement at the police station. The defendant testified that he followed the detective downstairs, but that when he tried to walk away, the officer directed him to "stay right there." He testified that he was then escorted from the hospital to a patrol car, where he was placed in the back seat. He testified that he could not get out, and that he was then taken to the police station. At the police station, defendant testified, the police let him out of the vehicle and took him into the police station through the front of the building. He testified that he and the police officer went through the building together to an office area, where defendant waited for some time, unrestrained. According to defendant, he felt he could not leave.

In denying defendant's motion to suppress, the trial justice concluded that defendant was not seized within the meaning of the Fourth Amendment and article 1, section 6, until Det. Santopadre informed him he was suspected of child abuse and read him his *Miranda* rights. In doing so, the trial justice fully discredited defendant's testimony as being vague and unreliable. She also credited Det.

- 14 -

Santopadre's testimony that, before leaving the hospital to search the Congress Avenue apartment, she had asked defendant and Mayra if they would each voluntarily go to the police station to give statements, and that they both agreed.

On a motion to suppress, this Court "accords deference to a trial justice's findings of historical fact." *State v. Terzian*, 162 A.3d 1230, 1238 (R.I. 2017) (quoting *State v. Casas*, 900 A.2d 1120, 1129 (R.I. 2006)). We will disturb such findings only if they are clearly erroneous. *E.g.*, *State v. Briggs*, 756 A.2d 731, 736 (R.I. 2000). By contrast, "this Court undertakes a *de novo* review of the record in order to independently determine whether the rights of the accused have been violated." *Terzian*, 162 A.3d at 1238.

Accordingly, we will reverse a trial justice's findings on a motion to suppress if the trial justice's findings reveal clear error, or if "our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *Briggs*, 756 A.2d at 736; *see Terzian*, 162 A.3d at 1238.

Article 1, section 6 of the Rhode Island Constitution and the Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, *see Mapp v. Ohio*, 367 U.S. 643, 650 (1961), preserve the right of the people to be secure in their persons against unreasonable searches and seizures. To that end, both "require that before a police officer can arrest a person,

he or she must have probable cause to support such a seizure." *State v. Ortiz*, 824 A.2d 473, 480 (R.I. 2003). Moreover, when authorities detain a person in violation of these rights, "any fruits of the illegal detention are inadmissible even if they are oral statements * * * for which adequate *Miranda* warnings had been given[.]" *State v. Mattatall*, 510 A.2d 947, 950 (R.I. 1986); *see Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest * * * is no less the 'fruit' of official illegality than the more common tangible fruits of an unwarranted intrusion.").

To determine whether a person is seized within the meaning of the Fourth Amendment and article 1, section 6, the central inquiry is whether, "in view of all the circumstances, a reasonable person would believe that he or she was not free to leave." *State v. Diaz*, 654 A.2d 1195, 1204 (R.I. 1995), *called into question on other grounds in State v. Ros*, 973 A.2d 1148 (R.I. 2009). This Court has set forth factors courts may consider in determining whether a person is seized, including "(1) the extent to which the person's freedom is curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police." *Id.*

Our independent examination of the record reveals no error in the trial justice's denial of defendant's motion to suppress: the trial justice's findings were

not clearly erroneous, nor does our independent, *de novo* review of the conclusions drawn from the historical facts establish that any violation of defendant's constitutional rights occurred. *See Briggs*, 756 A.2d at 736; *Terzian*, 162 A.3d at 1238.

In support of his contention that the trial justice erred, defendant argues that his freedom was curtailed from the time he arrived at the hospital because police directed defendant's movements and accompanied him almost the entire time he was at the hospital. The defendant provides no factual support for his assertion that the police accompanied him the entire time he was at the hospital, and the record reveals none. Rather, the record indicates that, between arriving at the hospital at around 4:30 a.m. and leaving to go to the Providence police station at around 10:52 a.m., both parents spoke with physicians, spoke with police twice, spoke with representatives of DCYF, and otherwise waited in the family rooms at the hospital.

The defendant relies on his own testimony to support his assertion that the police directed his movements at the hospital; the defendant points to his testimony that he was told to follow a detective because he had to give a statement at the police station, that he was escorted out of the hospital by a police officer, and that when he attempted to leave, an officer directed him to stay. However, in her factual findings on the motion to suppress, the trial justice rejected defendant's testimony as unreliable and vague, particularly rejecting defendant's testimony that he had tried

to walk away and was told to stop. To accept on appeal that these allegations transformed the encounter between defendant and police at the hospital into a seizure would require this Court to reject the trial justice's credibility determination that defendant's testimony was unreliable. After independently examining the record, including defendant's hearing testimony, we are satisfied with the trial justice's credibility determinations. *See Briggs*, 756 A.2d at 741 ("Upon review of a trial justice's decision on a motion to suppress, deference is given to the findings of the trial justice, and those findings shall not be disturbed unless they are clearly erroneous.") (quoting *State v. Ortiz*, 609 A.2d 921, 925 (R.I. 1992)).

The defendant further argues that police curtailed his freedom when they drove him to the police station in a police cruiser. We have considered similar arguments before and rejected them. *E.g.*, *State ex rel. Town of Little Compton v. Simmons*, 87 A.3d 412, 415 (R.I. 2014). The record reveals no reason to depart from our previous reasoning. Though defendant's freedom was curtailed for the duration of the ride, police did not use handcuffs or any further means of curtailment. Once at the police station, police took Mr. Jimenez to an office area, where he waited, unrestrained, then to an interview room, which was unlocked. Detective Santopadre checked on him several times to see if he needed anything. *Cf. Simmons*, 87 A.3d at 415 ("[The] defendant's freedom of movement was restricted only while he was seated in the back of the police cruiser, * * * and [he] was let out as soon as the trio

arrived[.]"); *State v. Vieira*, 913 A.2d 1015, 1021-22 (R.I. 2007) (upholding denial of the defendant's motion to suppress where the defendant voluntarily agreed to accompany the officers to the station in a police cruiser, police used no force against the defendant, and police never handcuffed the defendant).

The evidence accepted by the trial justice indicates that defendant's freedom was not—prior to the point at which police informed him that he was a suspect—so curtailed that a reasonable innocent person would not have felt free to leave; rather, the evidence indicates that both defendant and Mayra agreed to go to the police station to give statements voluntarily. *See Diaz*, 654 A.2d at 1205 ("The record is devoid of any evidence that defendant did not voluntarily accompany the police to the station.").

Further, the record reveals no use of force against defendant prior to his arrest, and nothing in the record indicates that Mr. Jimenez was informed that he was a suspect in a crime until the interview at issue began, when Det. Santopadre informed him, at the police station, that he was suspected of child abuse. There is no indication that officers told Mr. Jimenez he was not free to leave prior to that time. *See Diaz*, 654 A.2d at 1204 (enumerating factors for determining whether a Fourth Amendment seizure has occurred, including "the belief of a reasonable, innocent person in identical circumstances; and * * * whether the person had the option of not accompanying the police"); *Simmons*, 87 A.3d at 416 ("[A]lthough the police

- 19 -

did not tell the defendant that he was free to leave[,] likewise, they never told him that he was not free to leave.") (brackets omitted) (quoting *State v. Girard*, 799 A.2d 238, 248 (R.I. 2002)).

The defendant asserts that the subjective intent of the investigative officers indicated that he was not free to leave prior to his arrest. The defendant stresses that he was the focus of the investigation and a suspect from the time Det. Santopadre spoke to the physicians at the hospital. However, the subjective intent of the officers is not probative of whether a reasonable person would have felt free to leave, and nothing defendant points to as evidence of the investigators' subjective intent gives rise to an inference that investigators communicated their suspicion, verbally or nonverbally, to defendant. *See State v. Griffith*, 612 A.2d 21, 24 (R.I. 1992) ("The subjective intent of the police to detain a suspect is irrelevant unless the intent is communicated to the defendant."); *cf. State v. Corcoran*, 274 A.3d 808, 815-16 (R.I. 2022) (determining that an investigating officer's communications to the defendant that the officer suspected the defendant had been drinking and driving transformed the officer's suspicions from mere subjective opinion to objective indicia that the defendant was not free to leave). The defendant's attempts to argue his own subjective beliefs similarly fail. *See Diaz*, 654 A.2d at 1204.

Accordingly, we hold that the trial justice did not err by concluding that defendant was not seized without probable cause within the meaning of the Fourth

Amendment and article 1, section 6 prior to giving his statement at the police station, and therefore that the trial justice appropriately denied defendant's motion to suppress.

**Motion to Dismiss**

In his second assignment of error, defendant challenges the trial justice's denial of his motion to dismiss the indictment. The defendant alleges that the indictment was vague, in violation of his right to due process under the United States and Rhode Island Constitutions.

Prior to trial, defendant moved to dismiss all three counts of the indictment. At the hearing on the motion, defendant's counsel did not press any argument as to counts two and three, and counsel specifically stated that he understood, based on the bill of particulars filed for count two, the conduct that was alleged therein. The defendant's counsel did set forth an argument relating to the sought-after dismissal of count one of the indictment, which count alleged that defendant "on or about day and date between the 10th day of May, 2012 and the 7th day of July, 2012 * * * did murder Christina Jimenez in the Second degree, in violation of § 11-23-1 and § 11-23-2." The defendant asserted that the indictment was vague as to the dates of the offense alleged in count one and as to the facts that formed the basis for that count, particularly those facts that related to the cause of baby Christina's death. In an extensive colloquy, the state indicated on the record that it intended to prove that

baby Christina died as the result of multiple blunt-force injuries sustained over the time period indicated in the indictment, including the final head trauma. Defense counsel responded by indicating that he understood, and by affirming that this was what the state had to prove on count one.

The trial justice denied defendant's motion to dismiss the indictment, reasoning that dismissal was a severe remedy; the use of "day and dates" was not fatal to the indictment; any ambiguity in the indictment could have been clarified through a bill of particulars, which defendant never sought; and the state had indicated on the record what it intended to prove with respect to the cause of baby Christina's death.

"When reviewing a decision on a motion to dismiss an indictment, this Court 'accords great weight to a trial justice's findings; we will not set them aside unless they are clearly erroneous or fail to do justice between the parties.'" *State v. Sivo*, 809 A.2d 481, 486 (R.I. 2002) (alterations omitted) (quoting *State v. Reed*, 764 A.2d 144, 146 (R.I. 2001)). Nevertheless, "[m]inimal due process requires that a defendant be afforded 'adequate notice of the offense with which he is charged[,]'" *State v. Saluter*, 715 A.2d 1250, 1252 (R.I. 1998) (quoting *State v. Hendershot*, 415 A.2d 1047, 1048 (R.I. 1980)), *distinguished on factual grounds in State v. Thibedau*, 157 A.3d 1063 (R.I. 2017), and we conduct an independent examination of the

record where a defendant alleges the state has violated their constitutional rights. *State v. Ceppi*, 91 A.3d 320, 329 (R.I. 2014).

After independently examining the record in this case, we conclude that the trial justice did not err by declining to dismiss the indictment. Though defendant moved to dismiss counts two and three of the indictment—and now appeals the trial justice's denial of the motion with respect to count two, as count three was later dismissed pursuant to Rule 48(a)—defendant pressed no arguments before the trial justice as to those counts. We therefore perceive no error in the trial justice's denial of defendant's motion with respect to counts two and three, and we deem any arguments that defendant may make as to those counts on appeal to be waived. *See State v. Hudgen*, 272 A.3d 1069, 1080 (R.I. 2022) ("The raise-or-waive rule restricts an appellant from 'raising an objection or advancing a new theory on appeal if it was not raised before the trial court.'") (brackets omitted) (quoting *State v. Sanchez*, 206 A.3d 115, 121 (R.I. 2019)).

As to count one, alleging the murder of baby Christina in the second degree, we again have independently examined the record and perceive no error in the trial justice's denial of the motion to dismiss the indictment with respect to that count. We are satisfied that the indictment clearly set forth that defendant was charged with the murder of baby Christina in the second degree, in violation of §§ 11-23-1 and 11-23-2. Further, we are satisfied that any vagueness in the indictment could have

- 23 -

been cured by seeking a bill of particulars. *See* G.L. 1956 § 12-12-1.4 ("An indictment, information, or complaint shall be a plain, concise, and definite written statement of the offense charged. An indictment, information, or complaint which provides the defendant and the court with adequate notice of the offense being charged shall be sufficient if the offense is charged either: (1) By using the name given to the offense in terms of either the common law or by statute; or (2) By stating the definition of the offense in terms of substantially the same meaning."); *see also Saluter*, 715 A.2d at 1253 ("A general charge made by an indictment can be reduced to a specific factual offense in a bill of particulars that would specify in sufficient detail the elements of the crime being charged."); *State v. Hunt*, 137 A.3d 689, 693 (R.I. 2016) ("A defendant who is confronted with an ambiguous complaint or indictment has a remedy: a bill of particulars. * * * Having failed to seek a bill of particulars, a defendant should not be heard to complain about the lack of notice of the specificity of the charge.").

Further, we are satisfied that defendant suffered no prejudicial surprise at trial. As recited previously, counsel for defendant indicated on the record at the hearing on defendant's motion to dismiss the indictment that he understood the facts alleged

in support of count one of the indictment.  Accordingly, we discern no error in the trial justice's denial of defendant's motion to dismiss all counts of the indictment.

**Motion for New Trial**

In his final assignment of error, defendant challenges the trial justice's denial of his motion for new trial, contending that the trial justice overlooked and misconceived material evidence and that the state failed to prove the elements of each count beyond a reasonable doubt.

In issuing a bench decision concerning counts one and two—which decision the trial justice incorporated into her decision on defendant's motion for new trial— the trial justice made extensive findings of fact and explained her reasoning as to the conclusions and inferences she drew from those findings.  On count one, the trial justice found that on June 20, 2012, at around 12:30 a.m., baby Christina suffered a fatal brain injury that had been inflicted upon her, and a few hours later she descended into full cardiac arrest.  After she was resuscitated at the hospital, the physicians placed her on life support; she remained on life support until removed on July 7, 2012, and she died that same day.  The trial justice found that baby Christina had sustained four skull fractures, a subdural hemorrhage, a significant brain tissue injury and edema, retinal hemorrhages, and retinoschisis.  She further found that baby Christina had suffered several other injuries, inflicted at various times throughout her short life, including twenty-eight rib fractures, at least one of which

had occurred less than a week prior to baby Christina's admission to Hasbro; a fracture to the clavicle; a fracture to her pelvis; a fracture to her thumb; fractures to her lower legs; and a liver laceration.

The trial justice found that these injuries, beyond a reasonable doubt, were the result of child abuse, not accident or genetic predisposition. On this point, she credited the testimony of both Dr. Barron and Dr. Stanley that the brain injury—including the injuries to baby Christina's brain tissue and retinas—was not the result of a simple fall, regardless of whether the baby had hit an end table on her way down, as was reported. Rather, the brain injury to the baby was the result of acceleration/deceleration forces seen in abusive head trauma, or from blunt force. Further, the trial justice credited Dr. Stanley's testimony that, while the head injury was an independently fatal blow, baby Christina died from injuries sustained at various ages, which caused her to be a fragile infant.

The trial justice found that defendant was the perpetrator of these injuries. She credited Mayra's testimony that she was asleep from 10 o'clock the night before until she woke up to discover baby Christina in distress; the trial justice concluded that Mayra had not inflicted the head injury. She further found that there was no evidence that defendant and Mayra's infant son had left his crib that night, and further inferred from the medical testimony that that child could not have inflicted the head injury upon baby Christina. Finally, she found that there was no evidence

whatsoever that any other household members were in the bedroom that night. By process of elimination, she concluded that defendant was the only person who could have committed the act.

Finally, the trial justice found beyond a reasonable doubt that the infant was murdered with malice; she found that defendant had inflicted the significant and fatal brain injury upon the infant willfully and with wanton recklessness and extreme indifference to the sanctity of human life, noting the disparity in size and strength between the perpetrator, defendant, and the victim, baby Christina. She further noted that defendant, having committed the fatal blow around 12:30 a.m., placed baby Christina back in her crib and failed to report the injury or obtain medical treatment, leaving the infant dying for three to four hours before Mayra awoke and recognized the grave condition the baby was in. The trial justice found that defendant's behavior indicated a hardness of heart, cruelty, wickedness of disposition, recklessness of consequences, and a mind dispassionate of social duty. Accordingly, she found defendant guilty of second-degree murder.

On count two, first-degree child abuse, the trial justice found that baby Christina was abused on multiple occasions from about two weeks of age until she was admitted to Hasbro and placed on life support. She found that most of the twenty-eight rib fractures that baby Christina had suffered were posterior rib fractures, which could not have been caused accidentally. She found that the rib

fractures were inflicted on multiple occasions, based on the evidence of various degrees of healing. She further found that baby Christina had sustained a clavicle fracture, a pelvic fracture, and a liver laceration.

The trial justice further found that baby Christina had sustained significant injury and fractures across all her extremities. The trial justice accepted the medical evidence showing that baby Christina had suffered trauma to her femur bones on both thighs, a fracture on her right leg above the knee, an injury at her ankle, a fracture of her thumb, and a fracture of her wrist. The trial justice found specifically that baby Christina had sustained multiple CMLs, which are sustained as the result of shearing force, twisting, pulling, or wrenching. Based on the medical evidence as to how the injuries were inflicted and the sheer number of injuries, the trial justice found that the baby's fractured bones were inflicted by someone who acted deliberately and purposefully, not by mistake or accident. She concluded that baby Christina was abused prior to her death.

In determining who perpetrated this abuse, the trial justice found that defendant's quality of life had decreased when he moved to the Congress Avenue apartment: He had been evicted from an apartment close to his mother, with whom he was close; he had no meaningful relationship with Mayra's family; he, Mayra, and their infant son lived in a crowded bedroom, which became only more crowded upon the arrival of baby Christina; he had no vehicle and rarely left the house; and

there was evidence of strife between Mayra and defendant. The trial justice further found that defendant struggled to bond with his new daughter. Moreover, she found that defendant was one of baby Christina's primary caregivers and therefore he had ample opportunity to have one-on-one contact with the infant. She noted that Mayra did not remain cooped up; rather, she sometimes left the apartment and left the baby with defendant. She accepted the testimony of Maures, Alejandhina, and Mayra that they never hurt baby Christina and that Mayra's siblings had never had any caregiver contact with the infant. The trial justice fully discredited defendant's statements throughout the investigation in which he attempted to explain as accidental the many injuries baby Christina had sustained during her short lifetime.

The trial justice also considered her earlier finding that defendant had inflicted the fatal brain injury and inferred a pattern of conduct on the part of defendant. The trial justice concluded beyond a reasonable doubt that defendant abused baby Christina repeatedly by shaking, squeezing, grabbing, or twisting in escalating attempts to quiet her, resulting in fractures to ribs, her clavicle, her pelvis, her thumb, and her extremities. She found that the only person who physically abused baby Christina, causing her bones to fracture, was defendant. Accordingly, she found defendant guilty of first-degree child abuse.

A motion for new trial in the context of a jury-waived trial will not allow the defendant to obtain a new trial: Rule 33 provides instead that the trial justice may

vacate the judgment, take additional testimony, and direct the entry of a new judgment. *See, e.g.*, *State v. Cahill*, 196 A.3d 744, 757, 758 (R.I. 2018). Indeed, we have frequently stated that a motion for new trial in a jury-waived criminal trial "is of limited effectiveness because it merely affords a defendant an opportunity to convince the trial justice that he or she was wrong in his or her factual findings." *Id.* at 757-58 (quoting *State v. DiPetrillo*, 922 A.2d 124, 130-31 (R.I. 2007)).

Accordingly, when reviewing a trial justice's decision on a Rule 33 motion, "this Court 'applies the same deferential standard of review as would be applied to the Superior Court justice's factual findings on the merits.'" *Cahill*, 196 A.3d at 758 (brackets omitted) (quoting *DiPetrillo*, 922 A.2d at 131). Such findings are given great weight, and credibility determinations are afforded great deference. *Id.*; *see State v. Medeiros*, 996 A.2d 115, 121 (R.I. 2010). We will not disturb the trial justice's factual findings unless the justice "overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." *Cahill*, 196 A.3d at 758 (quoting *DiPetrillo*, 922 A.2d at 131).

In passing on the motion for new trial in the present case, the trial justice specifically stated that she had revisited her decision and found that it was consistent with the law and the evidence, and that she had neither overlooked nor misconceived relevant or material evidence. After viewing the trial justice's findings of fact and credibility determinations with proper deference, we agree with that assessment.

The defendant makes two arguments on appeal in support of his contention that the trial justice overlooked or misconceived material evidence. First, defendant challenges the trial justice's findings on counts one and two, contending that the record is devoid of any evidence as to where, when, or how the injuries to baby Christina—other than her head injury—occurred. However, defendant's arguments are not borne out by the record and by the trial justice's decision. First, defendant does not dispute that baby Christina sustained dozens of fractures across her body throughout her short life.[6] Moreover, there was ample medical evidence entered into the record at trial on which the trial justice relied to conclude that baby Christina had sustained injuries between two days and three weeks prior to her admission to Hasbro, and to conclude that those injuries were inflicted injuries: They were not the result of accident, but of deliberate actions such as shaking, squeezing, grabbing, or twisting.

Second, defendant similarly contends that there was no evidence that he harmed the infant, aside from the evidence supporting the trial justice's findings with respect to the head injury. Again, however, our review of the record reveals otherwise.

---

[6] Fractures are a *per se* "serious bodily injury" under the applicable child-abuse criminal offense statute. *See* § 11-9-5.3(c)(2).

- 31 -

As set forth previously, the trial justice carefully considered who could have perpetrated the abuse, specifically the injuries other than the head injury. Moreover, the trial justice properly drew inferences based on the evidence to conclude that it was defendant who had perpetrated the abuse. *See State v. Durand*, 465 A.2d 762, 767 (R.I. 1983) ("It is well settled that a factfinder may always draw inferences from the evidence presented, but the inferences must be based on some evidence, either direct or circumstantial.").

Finally, though defendant contends that the trial justice made erroneous credibility determinations, the trial justice's credibility determinations are afforded great deference. *See, e.g.*, *Cahill*, 196 A.3d at 758. The defendant offers no compelling reason to disturb the trial justice's credibility determinations in this case, and our review of the record reveals none.[7]

Thus, having thoroughly reviewed the record in this case, we are satisfied that the trial justice did not overlook or misconceive material evidence. Accordingly, we discern no error in the trial justice's denial of defendant's Rule 33 motion.

---

[7] The defendant urges this Court to consider that the trial justice erred by dismissing his contention that he was "taking the fall" so Mayra would not lose custody of their son. However, defendant did not set forth this argument before the trial justice in connection with his motion for new trial. We therefore decline to consider this contention. *See State v. Bido*, 941 A.2d 822, 828-29 (R.I. 2008) ("It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.").

**Clerical Error**

Finally, our thorough review of the record reveals that the judgment of conviction and commitment failed to reflect the unchallenged amendments to the indictment as to count two, first-degree child abuse. It is undisputed that Mr. Jimenez was charged with and convicted of first-degree child abuse in violation of § 11-9-5.3(b)(1), (d), (e), and (f). Therefore, when this case is remanded, we order that the Superior Court correct the judgment to reflect that Mr. Jimenez was convicted in count two for first-degree child abuse in violation of § 11-9-5.3(b)(1), (d), (e), and (f). *See* Super. R. Crim. P. 36 (providing for correction of clerical mistakes in judgment "arising from oversight or omission").

**Conclusion**

For the foregoing reasons, we affirm the Superior Court judgment of conviction and remand the record to that court with directions to correct the final judgment to reflect the proper statutory authority for count two, first-degree child abuse.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Christopher Jimenez. |
| **Case Number** | No. 2019-68-C.A. (P1/12-3389A) |
| **Date Opinion Filed** | June 29, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br><br>For Defendant:<br><br>Stefanie DiMaio Larivee, Esq. |

SU-CMS-02A (revised June 2020)